# United States Court of Appeals
## For the First Circuit

No. 04-1742

UNITED STATES,

Appellee,

v.

JOSEPH AITORO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Judith H. Mizner for appellant.
David H. Kyosza, with whom Michael J. Sullivan, United
States Attorney, and Kimberly P. West, Assistant U.S. Attorney,
were on brief, for appellee.

May 12, 2006

**STAHL, Senior Circuit Judge**. This appeal challenges the denial of defendant Joseph Aitoro's motion to suppress evidence and the validity of the sentence imposed after the defendant's entry of a guilty plea and subsequent conviction. We find no error in the court's denial of the motion to suppress or the court's factual findings at sentencing, but vacate the sentence imposed and remand the case for resentencing in light of United States v. Booker, 543 U.S. 220 (2005).

## I.

On the evening of July 10, 2001, several officers with the Boston Police Department (BPD) were conducting a field investigation in the area on the border between Roxbury and Dorchester known as Grove Hall.[1] The officers were stationed in the area around the intersection of Maple and Cheney Streets, a location described by the district court as "a high crime area with frequent street-level drug selling activity." On the night in question the weather was clear and the streets and intersection were well lit by street and building lights. Two officers, James Rattigan and John Conroy, were positioned on the roof of a four-story building overlooking the intersection, equipped with binoculars for surveilling the street below and with a walkie-talkie for communicating with the officers on the street. Three

_____

[1]We relate the facts as found by the district court during the suppression hearing and at sentencing.

more officers were positioned on Cheney Street, watching two teenagers sitting on a stoop down the block. Other officers had distributed themselves around the area.

Just after ten o'clock, appellant Joseph Aitoro and one Deshawn Williams walked down Maple Street in the direction of Cheney Street. The two men spotted the three officers on Cheney Street, who had gotten out of their car in order to interview the teenagers they had been observing.[2] Aitoro and his companion appeared quickly to recognize the three men as police officers. Officer Conroy, from up on the roof, heard one of the two men exclaim "Oh shit," and the pair then "did an abrupt about-face and sprinted in the reverse direction up Maple Street."

Both men were wearing loose Hawaiian-style shirts that partially obscured the officers' view of their waists from the roof, but as they turned to run, Officer Rattigan saw Aitoro grab at the waist of his pants, where Rattigan saw a bulge that he thought was a gun. Although Williams had his hands in front of him and Rattigan could not see his precise movements, Rattigan perceived Williams also grabbing at his waist, and suspected that he, too, was reaching for a gun. Rattigan radioed supporting officers with instructions to stop the fleeing men, warning that

_____

[2]The three officers were not in uniform, but they nevertheless "stood out like a sore thumb in the area." One wore a BPD baseball shirt, while the other two were visibly equipped with handcuffs, flashlights, and police identification.

they might be armed.  Officer Martin Conley and other officers in a van nearby saw Aitoro and Williams, who by then had slowed to a walk, and stopped them.  Conley frisked Aitoro and felt a pistol jammed into his pants at the waist.  A second officer frisked Williams and found he too was carrying a gun.  The officers arrested Aitoro and Williams.

Aitoro was held in a Suffolk County jail until October 27, 2001, when he was released on bail.  The record reveals little about Aitoro's activities or whereabouts over the course of the next several months, but on May 10, 2002, a team of officers from the BPD, along with agents from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), executed a search warrant at an apartment in Dorchester.  There they found Aitoro asleep in bed, along with two loaded firearms, additional ammunition, three bags of cocaine base, six bags of heroin, and a bag of marijuana.  They again arrested Aitoro.

On June 26, 2002, Aitoro was charged in an indictment with one count of possessing a firearm and ammunition as a convicted felon under 18 U.S.C. § 922(g)(1) (2000) stemming from the seizure of the gun from Aitoro's person in July 2001; a second count of the same stemming from the seizure of the two firearms from the room in which Aitoro was found in May 2002; two counts of possession with intent to distribute a controlled substance under 21 U.S.C. § 841(a)(1) (2000), one each for the cocaine base and the

heroin seized from the Dorchester apartment; and one count of possession of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 924(c). A superceding indictment handed down by a grand jury on July 24, 2002, reiterated the charges against Aitoro and added Deshawn Williams as a codefendant under another felon-in-possession charge.[3]

Aitoro moved to suppress the pistol found on his person in July 2001 as the fruit of an unconstitutional search.[4] He argued that the officers who stopped him on that July night lacked grounds to suspect him of wrongdoing, or, if they had rightfully stopped him, lacked grounds to frisk him. The district judge denied the motion, finding that Aitoro's exclamation at the sight of the police, his subsequent flight, his grabbing at his waist, and the fact that the incident took place in an area known for a high incidence of crime gave the police reason to stop Aitoro and sufficient concern for their safety to justify the frisk.

Under a plea agreement, Aitoro pled guilty to the felon-in-possession and narcotics charges, reserving his right to appeal the denial of his suppression motions and change his plea if successful. His trial on the charge of possessing a firearm in

---

[3]Williams and Aitoro were named together in the indictment, and Williams, like Aitoro, pled guilty to the felon-in-possession charge, but Aitoro is the sole appellant here.

[4]Aitoro also moved to suppress the drugs and firearms found in May 2002. The motion was denied and the issue is not raised on appeal.

furtherance of a drug trafficking offense resulted in an acquittal by a petit jury in January 2004.[5]

At sentencing, the court determined that Aitoro merited a criminal history category of V. The court calculated Aitoro's base offense level under the drug quantity guideline, USSG § 2D1.1, and found that Aitoro had possessed 5.85 grams of cocaine. Aitoro challenged the drug quantity finding, highlighting an apparent disparity between earlier and later recorded weights of the drugs the police had seized. The record contained three documents indicating the weight of the drugs as measured at various times after Aitoro's arrest. The first was an inventory taken of Aitoro's possessions at the time of his arrest in May 2002. That inventory was produced by the ATF, and documented the seizure, among other items, of:

- NARCOTICS: HEROIN, QTY: .9, MEA: GRAMS, (1) PLASTIC SANDWICH BAG CONTAINING TWO SEPARATE BUNDLES OF SUSPECTED HEROIN

- NARCOTICS: CRACK COCAINE, QTY: 2.5, MEA: GRAMS, (3) PLASTIC SANDWICH BAGS CONTAINING SUSPECTED CRACK COCAINE

- NARCOTICS: MARIJUANA, QTY: 14.7, MEA: GRAMS, (1) PLASTIC SANDWICH BAG CONTAINING SUSPECTED MARIJUANA

According to the ATF documents, after being stored for six weeks by the ATF, the drugs were sent to a Massachusetts drug laboratory for

---

[5]The principal defense theory at trial was that the government had not proved that Aitoro's possession of the firearms was "in furtherance" of drug trafficking.

analysis.  A second document, a receipt given by the state lab to the ATF when the lab received the drugs, listed:

- Six (6) Glassine Bags of Powder - 4.91 grams[6]

- Three (3) P/Bs White Rock Substance - 12.96 grams

- One (1) P/B Green Leaf Substance - 18.02 grams

These weights were identified as "Gross Weight[s]" on the receipt, indicating that they were the combined weights of the drugs themselves and the bags holding those drugs.  The lab analyst who processed the heroin weighed the contents of only one of the six glassine bags of heroin but did not weigh the marijuana.  He did calculate the precise net weight of the cocaine seized.  His worksheet describing his analysis of the cocaine base listed a gross weight of 12.9182 grams and a net weight of 5.8543 grams.

Aitoro contended that the lower weights indicated on the ATF inventory cast too much doubt on either the reliability of the later weights or the identity of the earlier- and later-weighed drugs to support a finding that the later figures were accurate measures of the drugs with which Aitoro had been found.  The district court disagreed, finding that the drugs weighed in the

---

[6]Although the ATF inventory and the state lab receipt described the heroin packaging somewhat differently ("two separate bundles" versus "six glassine bags"), the suggestion is that each of the "two separate bundles" listed on the ATF inventory contained three small bags of heroin.  Nowhere does the defendant suggest that the ATF and state lab descriptions are inconsistent.

state lab were the drugs seized from Aitoro's room, and that the state lab weights were accurate. The state lab's 5.8543-gram figure for the cocaine base became the basis for a base offense level of 26 under USSG § 2D1.1.

The district court then imposed a two-level upward adjustment for possessing a firearm in close proximity to controlled substances under USSG § 2D1.1(b)(1) and a three-level downward adjustment for acceptance of responsibility under USSG § 3E1.1(a) & (b). These adjustments produced a total offense level of 25. The guidelines sentencing range that resulted was for a sentence of between 100 and 125 months. The court, sentencing before the decision in Booker, took the Guidelines as binding and imposed a sentence of 100 months, the low end of the guidelines range. It did so despite noting that Aitoro had a long arrest record and after giving him a warning that he needed to reform. It observed that Aitoro was obviously intelligent, was an engaged participant in his own defense, accepted responsibility for his crime, and had a grandmother who loved him and a daughter for whose upbringing he was responsible. Aitoro raised no constitutional objection to his sentence. He now appeals the denial of his motion to suppress and challenges his sentence.

## II.

Aitoro presses five questions on appeal. He argues: 1) that the July 2001 stop-and-frisk was unconstitutional and that the

gun found on his person should have been suppressed;[7] 2) that the case should be remanded for resentencing under Booker, as interpreted by United States v. Antonakopoulos, 399 F.3d 68 (1st Cir. 2005) and United States v. Heldeman, 402 F.3d 220 (1st Cir. 2005); 3) that the government presented insufficient evidence to support a finding by a preponderance that Aitoro possessed more than five grams of cocaine base and 4) that in any event the quantity of drugs in his possession had to be found by a jury and beyond a reasonable doubt; and 5) that the terms of Aitoro's supervised release should be interpreted to permit Aitoro's probation officer to administer a maximum of three drug tests during the supervised release period. We take each argument in turn.

A.      **Stop-and-Frisk**

Aitoro first challenges the district court's denial of his motion to suppress the gun found during the July 2001 stop-and-frisk, arguing that the police lacked grounds for both the stop and the search. When reviewing a district court's determination that evidence must or need not be suppressed on Fourth Amendment grounds, we review the district court's factual determinations for

---

[7]Aitoro made certain extemporaneous statements to the police at the time of his first arrest, and moved to suppress those statements along with the gun. There is no argument made that the statements should be suppressed if the search that produced the gun was proper, and for the sake of simplicity we therefore discuss only suppression of the gun without making further mention of the statements.

clear error.  United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005) (citing United States v. Cruz, 156 F.3d 22 (1st Cir. 1998)). We review de novo the legal question whether a particular set of facts justified a warrantless search or seizure.  Id.

"An officer may conduct a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot."  Id. (citing Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)). "After a valid Terry stop, a pat-frisk for weapons is also permissible where 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'"  Id. (quoting Romain, 393 F.3d at 71).  Whether the stop and the frisk were reasonable "is evaluated in the context of the totality of the circumstances and demands a 'practical, commonsense approach.'" United States v. Jones, 432 F.3d 34, 40 (1st Cir. 2005) (quoting United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998)).  We have little difficulty concluding that both the stop and the frisk of Aitoro were proper.

Our conclusion as to the initial stop is dictated by the Supreme Court's decision in Illinois v. Wardlow, 528 U.S. 119 (2000).  Wardlow turned primarily on two factors: the defendant's presence in an area known for heavy narcotics trafficking and the defendant's "headlong flight" the moment he noticed the police. Wardlow, 528 U.S. at 124; see also United States v. Scott, 270 F.3d

-10-

30, 41 (1st Cir. 2001) ("An individual's flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under Terry." (citing Wardlow, 528 U.S. 119)). This case would be closer to the outer bounds of Wardlow had the surveilling officer not heard one of the two fleeing men cry "Oh, shit" before turning to run, but in light of that exclamation the officer had all the more reason to think that the men had seen the police officers and were attempting to evade apprehension. Furthermore, when the officers on the ground encountered Aitoro and Williams a few minutes after they took flight, they noticed them looking warily over their shoulders, as if concerned about pursuers. That observation could reasonably have further heightened the officers' suspicion that the two men had run in order to avoid police detection.

Aitoro attempts to distinguish his case by noting that in Wardlow, the police were specifically on the lookout for drug-purchasing customers and scouts for drug traffickers looking for approaching police, and that in that context, the fact that the defendant in Wardlow was spotted carrying a bag made him, Aitoro contends, a particular target for suspicion. This was because the bag might have led the police to believe that he was participating in drug trafficking. Aitoro claims that he was doing nothing that would have singled him out as a participant in drug trafficking, which was here, as in Wardlow, the reason for the neighborhood's

-11-

reputation as a high-crime area and the reason the police were in the area in the first place. But Aitoro's exclamation and his apparent reaching for his gun gave the police at least as much additional basis for suspicion of involvement in narcotics trafficking here as the <u>Wardlow</u> defendant's bag gave the police in that case.[8]

Aitoro also raises a question about the factual predicate for the district court's legal conclusion. He suggests that the district court's conclusion that Aitoro recognized the officers in question as police officers was dubious because the officers were not in uniform and were standing perhaps 80 feet from the corner when Aitoro and Williams came around the bend. The reasonableness of a search entails an objective inquiry into the search from the perspective of the searching officers, however, so what is relevant is not whether Aitoro actually perceived the officers as police

---

[8]It is true that there is no "firearm exception" to the requirement that the police have particularized suspicion of wrongdoing before conducting a <u>Terry</u> stop, which means that whether the suspected criminal activity is possession of a gun or something else, the police have to be able to justify a stop under the same standard; the burden of justification where guns are concerned is not lighter because the contraband is potentially more dangerous. <u>See</u> <u>Florida</u> v. <u>J.L.</u>, 529 U.S. 266, 272-73 (2000). But here, the question is not whether the officers had sufficient reason to think Aitoro was in illegal possession of a gun, but whether the circumstances as a whole, including the fact that Aitoro had apparently reached for a gun, were enough to give them sufficient concern that some sort of criminal activity, such as narcotics trafficking, was afoot.

officers, but whether the officers reacted reasonably on seeing him flee.

Aitoro finally contends that, even if the stop itself was permissible, the concomitant search of his person was not. This argument is unavailing. When an officer sees a bulge in a detainee's clothing and reasonably believes that bulge to be a concealed weapon, under the right circumstances the officer will have license to search the detainee. Here, "the bulge that the officer observed in [Aitoro's waistband], when viewed in light of the other details surrounding the encounter," -- i.e., Aitoro's flight from the police and the fact that the neighborhood was known for a high incidence of crime -- "permitted a reasonable inference that appellant was armed and dangerous." United States v. Proctor, 148 F.3d 39, 42 (1st Cir. 1998); see also United States v. Trullo, 809 F.2d 108, 113-14 (1st Cir. 1987) (frisk incident to a stop was justified by officer's concern that bulge in defendant's clothing was a weapon). Aitoro makes a second argument based on the fact that one of the officers on the roof radioed to the officers on the ground to tell them to apprehend Aitoro and his companion and to warn them that he had a gun, and that the frisking officer had not seen the bulge that was thought to be a gun firsthand. Aitoro implicitly questions whether it was reasonable for the officer on the ground to rely on the warning of the officer on the roof, but his argument fails. The police may rely on information from other

members of their force and respond accordingly. Cf. Romain, 393
F.3d at 71 ("[p]olice officers are not limited to personal
observations in conducting investigatory activities" (citing Adams
v. Williams, 407 U.S. 143, 147 (1972))). Under the circumstances
of the stop, and given warning that Aitoro likely had a gun, the
detaining officer was justified in frisking him, and the gun found
during the frisk need not have been suppressed.

**B.        Booker Remand**

We next address the question of remand in light of
Booker, 543 U.S. 220, because our decision to remand the case has
some effect on how we approach the other questions Aitoro has
raised. The trial court erred in sentencing Aitoro because it
understood the Sentencing Guidelines as binding and sentenced
Aitoro accordingly. See Antonakopoulos, 399 F.3d at 75. Booker
subsequently excised the portions of the Federal Sentencing Act
that mandated sentencing within a calculated Guidelines range, and
we now review sentences imposed before Booker by assessing the
probability that a different sentence would have been imposed had
the district court understood the Guidelines as advisory. Where a
defendant has made an argument to the district court that it should
not consider itself bound by the Guidelines, the burden is on the
Government to demonstrate the harmlessness of the Booker error,
United States v. Vazquez-Rivera, 407 F.3d 476, 489 (1st Cir. 2005),
but where the defendant has not preserved such an objection, we

-14-

review for plain error, and the burden is on the defendant to demonstrate "that there is a reasonable probability that the district court, freed of mandatory guidelines, would have given him a lower sentence." Antonakopoulos, 399 F.3d at 83. We are not "overly demanding as to proof of probability where, either in the existing record or by plausible proffer, there is reasonable indication that the district judge might well have reached a different result under advisory guidelines." Heldeman, 402 F.3d at 224. Because Aitoro did not preserve a Booker objection below, we apply this plain error analysis.

We believe there is some chance that the court might have imposed a different sentence under an advisory Guidelines regime. To begin with, the district court sentenced Aitoro to the minimum sentence available within the Guidelines range, a factor that is not dispositive of our plain error consideration but which we have deemed highly relevant. See, e.g., United States v. Wilkerson, 411 F.3d 1, 10 (1st Cir. 2005). Perhaps cutting against Aitoro is the judge's comment that Aitoro had a "terrible" record, admonishing him that, "You've just got to get out of this" and that, "At some point someone is going to throw away the key," but that is likewise not dispositive, see United States v. Lewis, 406 F.3d 11, 21-22 (1st Cir. 2005), and it is notable that the court did not "throw away the key" itself. Addressing Aitoro, the court indicated some of its reasons for not doing so, saying, "You, obviously, have a

brain and the ability to use it," and highlighting its hope for Aitoro's rehabilitation by continuing, "When you get out you need to use that brain of yours and support your kids and work." The court also praised Aitoro's involvement in his own defense, and noted that he had a loving family and a baby daughter to support. The court noted the "sad[]" fact that the sentence it imposed, long as it was, was shorter than many, because the drug sentences it is routinely called upon to impose "are off the chart," perhaps indicating a concern that the Guidelines recommendations fail in some cases to take into account relevant mitigating circumstances. The court's apparent sympathy for the defendant,[9] stated hope for his rehabilitation, and frustration with the length of some sentences imposed in drug cases, together with the fact that it sentenced at the bottom of the Guidelines range, are sufficient to carry the relatively undemanding burden a defendant must meet under Antonakopoulos and Heldeman.[10]

---

[9]Of particular note is the court's indication of the interest it took in Aitoro's family circumstances. Under the Guidelines, courts are discouraged from taking family circumstances into account, see USSG § 5H1.6, and before Booker the court would have been unlikely to take them into account in imposing sentence. After Booker, however, the fact "[t]hat a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing the statutory factors apart from the guidelines." United States v. Smith, No. 05-1725, --- F.3d ---, 2006 WL 893622, at *3 (1st Cir. April 7, 2006).

[10]Following our suggestion in Heldeman that information tendered to the court in a supplemental filing may be useful in demonstrating the requisite probability that a court would sentence differently under an advisory system, Aitoro has made an

## C.            The Drug Quantity Finding

Aitoro next challenges the drug quantity finding that supports the sentence imposed.  Although we are vacating that sentence, we think it wise to address the propriety of the quantity determination in order to aid the district court at resentencing. The district court imposed sentence on the basis of its determination that Aitoro had been in possession of 5.85 grams of cocaine base.  It is the government's burden at sentencing to prove drug quantity by a preponderance of the evidence, United States v. Sepulveda, 15 F.3d 1161, 1198 (1st Cir. 1993), and Aitoro contends that the drug quantity found by the court was unsupported by such a preponderance.

There were significant disparities among the recorded weights of the drugs at issue as variously measured by the ATF in

_____

"Antonakopoulos proffer" (more properly a "Heldeman proffer").  The filing identifies information, most particularly family circumstances, that the district court might view in a different light in a post-Booker world, and information that has emerged since sentencing, such as Aitoro's so-far successful enrollment in employment-related courses offered via a prison program.  We have noted that "if a remand for resentencing is otherwise justified, it is quite arguable that the sentence on remand can and should take account of intervening facts that normally bear on sentencing," United States v. Lata, 415 F.3d 107, 113 n.3 (1st Cir. 2005) (citing United States v. Hughes, 401 F.3d 540, 560 n.19 (4th Cir. 2005)), but that in evaluating the need for Booker remand "our focus is primarily upon what was known at the time of sentencing." Id. at 113.  We are skeptical of the propriety of considering post-sentencing developments in the ordinary Booker-remand case, but here we are persuaded that Aitoro's case requires remand solely on the basis of facts known at the time of sentencing and so need not decide whether and when it might be permissible to do so.

-17-

its initial inventory of the items seized, by the Massachusetts state drug lab on the receipt it gave the ATF, and on the worksheet describing the results of the state lab's analysis. The ATF inventory listed the gross weights of the drugs and packaging seized as 14.7 grams for the marijuana, 2.5 grams for the cocaine base, and 0.9 grams for the heroin. The state lab receipt listed higher gross weights for each of the drugs: 18.02 grams for the marijuana, 12.96 grams for the cocaine base, and 4.91 grams for the heroin. The state lab analysis reported a slightly lower and more precise gross weight for the cocaine base -- the only drug fully weighed by the lab -- at 12.9182 grams.

The question on appeal is whether the disparities are better explained by tampering with or mistaken replacement of the cocaine base while it was in ATF custody or by inaccuracy in one of the scales. The district court concluded that the ATF scale was highly inaccurate, while Aitoro contends that tampering is the obvious explanation. We agree with the district court.

Aitoro's argument asserts that the marijuana and heroin weights stayed roughly the same between being weighed by the ATF and by the state lab, while the cocaine base weight shifted dramatically. Were two drug packages to have registered consistent weights at the two different times of measurement while a third registered a dramatic increase, we would think the district court ought to have been wary of relying on the heavier of the disparate

-18-

measurements. Such a scenario would suggest that the first and second scales were similarly accurate, and the unexplained disparity would suggest tampering or mistake. Here, however, the marijuana registered an increase of 3.3 grams (roughly a 22% increase), the cocaine base an increase of 10.5 grams (a 420% increase), and the heroin an increase of 4.0 grams (a 444% increase).[11]

While in terms of gram weight the cocaine base registered a greater increase than the heroin or marijuana, all of the initial weights appear so divergent from the weights listed by the state lab that the district court concluded that one of the scales, the one used by the ATF, was simply and grossly inaccurate. Bolstering

_____

[11]Aitoro's argument that the heroin weights on the ATF inventory and on the state lab worksheet were roughly consistent assumes that the weight on the ATF sheet was a net weight, an assumption that makes little sense, rather than a gross weight, which by all indications it was. The state lab, although it did not weigh all of the heroin, did weigh the contents of one of the six small bags of it, and found the net weight, i.e., the weight of the drug itself without the packaging, to be 0.08 grams. Aitoro assumes the weight of the other five bags to be roughly the same, leaving an estimated net weight of about 0.48 grams. It is this net weight that Aitoro says is approximately equal to the 0.9-gram weight reported on the ATF inventory. But the 0.9-gram figure listed on the ATF document purports to be the weight of the heroin in its packaging, and the agent who took the inventory testified at trial that he weighed the heroin while it was still in the glassine bags. The 0.9-gram weight thus bears comparison not to a hypothetical 0.48-gram net weight for the heroin alone, but to the 4.91-gram weight recorded on the state lab drug receipt. The greater disparity between the ATF and state lab figures with respect to the heroin undermines Aitoro's argument, because a consistently wide disparity between the state and ATF figures suggests not tampering, but an imprecise or malfunctioning scale.

this conclusion, there was testimony at trial and at sentencing stating that the state lab scale was calibrated daily, monthly, and annually and was accurate to within a fraction of a milligram at the time the drugs here were weighed. There was also testimony that the scale used by the ATF was an un-calibrated scale used by agents in the field, and that it was roughly handled, being thrown in car trunks and used by close to a hundred different agents. Its purpose, the testifying agent suggested, was not to produce drug weights for evidentiary purposes but to provide a rough bureaucratic accounting of drugs seized. The agent noted that the ATF's practice on seizing drugs was to send them out to a state or federal lab for official weighing and analysis, and that in fact the only reason the ATF had begun weighing drugs at all was because the agency had started to use a computer system that required entry of a drug-weight figure before it would print out a computerized tag to be affixed to seized packages. The inference is that the ATF was not concerned with producing an accurate weight as much as with generating a number that it could enter into its computer. On balance, it was reasonable for the district court to conclude that it was more likely than not that the cocaine weighed by the state lab was the cocaine seized from Aitoro, and that the state lab weight was accurate.[12]

---

[12]Aitoro's subsidiary argument challenges the sufficiency of the proof offered of the chain of custody of the drugs between seizure and analysis. In order to meet its burden of demonstrating

**D.          Drug Quantity as an Element**

Aitoro makes another challenge to the drug quantity finding, one of potentially greater consequence but of limited relevance to the case at hand. Drug quantity was, as we have discussed, determined by the judge at sentencing and was not proved to a jury or admitted by Aitoro. In addition to being vital to calculating a recommended sentence under the Sentencing Guidelines, drug quantity determinations can bear on a defendant's sentence under the drug-possession statute itself. See 21 U.S.C. § 841. Aitoro challenges our decision in United States v. Goodine, 326 F.3d 26 (1st Cir. 2003), in which we decided that the drug quantity determinations that drive the sentencing restrictions under § 841 may be made by a judge, rather than a jury, because the various threshold drug quantities are not elements that distinguish between different offenses. Goodine's approach has been rejected

_____

drug quantity, the government must perforce make a satisfactory showing of the identity of the drugs weighed with the drugs seized. Where there is some indication that the drugs weighed may not be the drugs seized, the government will have to go farther to demonstrate a chain of custody proving identity. Cf. United States v. Ladd, 885 F.2d 954, 956 (1st Cir. 1989). Where there is no such indication, credible testimony that the drugs were in official hands at all times will generally be enough to sustain a sentencing court's findings. Here, the descriptions of the drugs and the drug packaging on the ATF receipt were consistent with the state lab's descriptions of the drugs it received, and there was testimony at trial by an agent named Mark DeSantis that the drugs seized by the ATF were the same drugs as were turned over to the state lab. That was enough to give the court reason to believe the drugs weighed were the drugs seized.

elsewhere, see, e.g., United States v. Gonzalez, 420 F.3d 111 (2d Cir. 2005); United States v. Velasco-Heredia, 319 F.3d 1080 (9th Cir. 2003); see also United States v. Vazquez, 271 F.3d 93, 107-26 (3d Cir. 2001) (en banc) (Becker, J., concurring), but it is the law of this circuit.

While the general rule is that we are "bound by prior panel decisions directly on point," Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 160 (1st Cir. 2004) (citing Jusino v. Zayas, 875 F.2d 986, 993 (1st Cir. 1989)), Aitoro invokes our authority to reconsider a prior panel decision in light of intervening controlling authority. See United States v. Rodriquez, 311 F.3d 435, 439 (1st Cir. 2002). Specifically, he argues that the decision in Booker undercut our earlier decision in Goodine. In an appropriate case, we could consider this argument, but Aitoro's sentence was not imposed subject to a mandatory minimum, and because the mandatory minimum that would have applied was 60 months, and Aitoro received a sentence of 100 months, the chances are slim that on remand Aitoro's sentence will turn on whether or not a § 841 minimum may be lawfully applied. For these reasons, we need not address the Goodine question here.

One thing that is abundantly clear, however, is the error of Aitoro's suggestion that "even when not used to invoke a mandatory minimum sentence, drug quantity is an element of the offense which must be established by proof beyond a reasonable

-22-

doubt before it is employed for sentencing purposes." Aitoro apparently seeks a declaration that, because drug quantity, when used to determine a defendant's sentence under the Sentencing Guidelines, can make a large difference in a defendant's sentence, it must be proved to a jury beyond a reasonable doubt. We have recently rejected this view, see United States v. Yeje-Cabrera, 430 F.3d 1, 23 (1st Cir. 2005), and Aitoro's argument as to this point is foreclosed.

E.        **Future Drug Testing**

Finally, Aitoro challenges one of the terms of supervised release imposed by the court. He contends that the district court ought to have imposed a limit on the number of drug tests that his probation officer will be permitted to require of him during his term of supervised release. It is recognized error not to impose such a limit, leaving the probation officer's discretion unbounded. See United States v. Melendez-Santana, 353 F.3d 93, 102-06 (1st Cir. 2003); 18 U.S.C. § 3583(d). Aitoro did not raise the issue below, however, and we do not correct unpreserved Melendez-Santana errors on appeal. See United States v. Padilla, 415 F.3d 211 (1st Cir. 2005) (en banc). We do note that the "standard conditions" worksheet the district court used for specifying the conditions of supervised release lists as a condition "one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer," and offers

-23-

no place for a judge to enter a maximum number of tests as required by Melendez-Santana.

While the Melendez-Santana error here does not contribute to our decision to remand, we do find it surprising that five months after Melendez-Santana was decided, the district court was provided a sentencing form whose use, when filled out as intended, guaranteed a violation of the supervised release statute. In resentencing in this case, and, if it has not already begun to do so, in sentencing in future cases, the district court should use a sentencing form that implements § 3583(d) as required by Melendez-Santana.

### III.

For the foregoing reasons, the denial of Aitoro's motion to suppress is **affirmed**, his sentence is **vacated**, and the case is **remanded** to the district court for resentencing.