LIPEZ, Circuit Judge,
dissenting.
The majority concedes that the district court’s most critical factual finding' — 'that the officers believed Wright might be carrying a gun — lacks record support. It nevertheless manages to uphold the court’s ultimate finding of reasonable suspicion. It does so by creatively interpreting or recasting other findings of the court, filling in the gaps with its own speculation, and avoiding the district court’s explicit reliance on the location of the stop — “that area of Boston” — in its reasonable suspicion analysis. As I shall explain, the facts and inferences actually supported by the record do not provide a sufficient foundation for the finding of reasonable suspicion. Moreover, the district court’s reliance on the character of the neighborhood after declining to find it was a “high crime area” is a far-reaching error that should not be ignored. I therefore respectfully dissent.
I.
The majority reviews the events leading up to Wright’s stop in sequence, address *214 ing Wright’s challenges to the inferences the court drew from the historical facts as part of its scrutiny of each of Wright’s four significant behaviors: (1) leaning forward from the backseat of the car in which he was a passenger; (2) quickly exiting the vehicle and running down the street; (3) tugging at the right side of his sweatshirt; and (4) ignoring the officers’ orders to stop. I take a similar approach, but begin by focusing on Wright’s challenge to the two specific inferences challenged by Wright: first, that Officer Bordley believed Wright had identified the police car and, second, that several officers who saw Wright running suspected he was carrying a weapon. Once the landscape of permissible facts and inferences is established, I explain why the totality of those circumstances fails to establish a reasonable suspicion that Wright was engaged in criminal activity.
A. The Court’s Inferences about the Officers’ Beliefs
1. The Role of Deference
Trial courts unquestionably have the “superior vantage point” in examining the circumstances alleged to support reasonable suspicion, United States v. Espinoza, 490 F.3d 41, 46 (1st Cir.2007), and “a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and law enforcement officers.” Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Deference is owed to the trial judge’s ability to “view[] the facts of a particular case in light of the distinctive features and events of the community,” and the police officers’ similar ability to see the facts in light of their “experience and expertise.” Id. The background facts known by the court and officers “provide a context for the historical facts, and when seen together yield inferences that deserve deference.” Id.
Notwithstanding a trial judge’s general familiarity with a community, the judge’s findings on the facts underlying a particular seizure must draw support from the evidence in the record. Such evidence frequently will include the officers’ own stated inferences about what they saw and heard. In Ornelas, for example, where the Supreme Court examined the applicable standard of appellate review for trial court rulings on reasonable suspicion, the seizure at issue occurred after a deputy who was searching the interior of a car noticed that a door panel felt loose. Deputy Luedke “suspected that the panel might have been removed and contraband hidden inside,” and he discovered two kilograms of cocaine when he dismantled the panel. Id. at 693, 116 S.Ct. 1657. Luedke testified that a rusty screw near the loose panel indicated to him that the screw had been removed at some time. Although the Supreme Court in Ornelas rejected deferential review for “ultimate determinations of reasonable suspicion,” id. at 697, 116 S.Ct. 1657, it emphasized that reviewing courts must defer to district court findings on underlying facts and inferences such as those reported by Luedke.
To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel. An appeals court should give due weight to a trial court’s finding that the officer was credible and the inference was reasonable.
Id. at 700, 116 S.Ct. 1657.
2. Deference in this Case
The hierarchy of review described by the Court in Ornelas — an appellate court *215 giving due weight to the trial judge’s finding that the officer’s stated inference was reasonable — cannot be applied to the inferences that are challenged here. The findings at issue — Officer Bordley’s belief that Wright had “made” the police car and that the officers believed Wright had a gun in his pocket — were drawn solely by the court, without any testimony from the officers, to whom the inferences were attributed. Bordley did not testify that he believed Wright had identified the police car, but only that he had seen Wright lean forward to look at the unmarked cruiser. None of the three officers who testified that Wright grabbed or tugged at the right side of his sweatshirt as he ran reported a belief that he was carrying a weapon. Officer Brown stated that, once Wright got out of the car, “he turned to his right, grabbed onto his hooded sweatshirt pocket right about here and began to run up Blue Hill Avenue.” Officer Celester testified that Wright was “tugging” at his clothes with his right hand, in his “waist area,” and that he “appeared to be trying to pull something out of his waist area.” Officer Bordley said that Wright “stepped out of the motor vehicle, grabbed the right side of his sweater and took off running up Blue Hill Avenue.”
Importantly, although Officer Celester’s testimony in particular supports an inference that the officers believed Wright was carrying something in his pocket, nothing in any of the testimony provided a basis for the coui’t to conclude that the officers believed the item to be a weapon. They did not say that he seemed to be carrying something heavy. They did not report seeing a gun-like bulge in his pocket. This case would be very different if there had been such testimony. If the officers had reported some characteristic particularly suggestive of a weapon, the court could have based its conclusion that they inferred Wright was carrying a gun on that observation-even without the explicit statements usually provided by officers as to their belief. See United States v. Aitoro, 446 F.3d 246, 249 (1st Cir.2006) (noting that police officer “saw a bulge that he thought was a gun”); cf. United States v. Moore, 235 F.3d 700, 702 & n. 1 (1st Cir.2000) (noting that officer, who reported seeing defendant holding his hand “clenched at his side as if he was attempting to conceal something in it,” testified that he thought it might be a weapon or contraband). The district court thus drew an inference on behalf of the officers that they did not articulate themselves, and the inference relies on no fact suggesting that Wright had a gun, rather than some other, lawful item, in his pocket. When someone runs with something — anything (a cell phone, a wallet, a pack of cigarettes) — in the front pocket of a sweatshirt, it is natural to try to secure it.
Given the importance of the officers’ “experience and expertise” in identifying possible criminal activity, and the natural inclination of officers to draw upon that experience in explaining the significance of conduct that they have observed, I am troubled by the district court’s reliance on speculation to assign the officers a state of mind that they could have — but did not— disclose through their testimony. I understand that the reasonable suspicion determination does not turn on “what the officer himself believed but, rather, on what a reasonable officer in his position would have thought.” Espinoza, 490 F.3d at 47; see also United States v. Riddíaz, 529 F.3d 25, 29 (1st Cir.2008) (“Reasonableness in this context is a construct that must be judged according to objective criteria----”). In its effort to rewrite the district court’s decision, the majority concludes that the court’s statements about the officers’ beliefs could be interpreted as an imperfect way of expressing the court's view that reasonable officers would have concluded that Wright had recognized the *216 police cruiser and would have believed that he might be carrying a weapon. Even if that rephrasing accurately reflected the court’s findings, however, my concern would remain.
Where the officers themselves had the opportunity to attribute a suspicious connotation to conduct they observed, but did not do so, the court’s speculative inferences are seriously weakened. The officers on the scene are in the best position to assess the significance of the developing facts, and the officers here had every incentive to fully explain why they believed they were justified in detaining Wright. Their failure to articulate the beliefs the court attributes to them may indicate that they lacked such perceptions of Wright’s conduct, but whatever the reason for their silence, the court’s inferences about what a reasonable officer could have believed lacked an important factual indicator of such reasonableness — -the expressed beliefs of the officers on the scene. Cf., e.g., United States v. Dubose, 579 F.3d 117, 121 (1st Cir.2009) (reporting officer’s testimony that he became suspicious because of defendant’s actions, including that defendant’s “conduct was similar to the conduct involved in other drug transactions in the area”); United States v. Soares, 521 F.3d 117, 118, 120 (1st Cir.2008) (reporting officer’s testimony that movements in a car in which the defendant was a passenger “concerned him” and that officers saw “ ‘furtive movements’ ” that were “ ‘not ordinary’ ”); United States v. Taylor, 511 F.3d 87, 89 (1st Cir.2007) (describing officer’s testimony that his “suspicions [were] aroused by [the defendant’s] uncharacteristically nervous demeanor and furtive movements”); United States v. Baskin, 401 F.3d 788, 792 (7th Cir.2005) (describing officer’s testimony that her “suspicions were aroused” by the defendant’s driving); United States v. Chhien, 266 F.3d 1, 4 (1st Cir.2001) (describing officer’s increasing suspicions during questioning of defendant); United States v. Montero-Camargo, 208 F.3d 1122, 1127 (9th Cir.2000) (en banc) (describing officer’s testimony about conduct by the defendants that had “aroused [the officer’s] suspicions”).
Having stated my more general concern about inferences founded only on speculation, I turn to closer scrutiny of the two specific findings at issue.
3. “Making” the Police Car
The district court’s first step in drawing the inference that Bordley believed Wright had identified the unmarked car as a police cruiser was unremarkable. Bordley testified that he saw Wright lean forward from the backseat of the car “to observe the unmarked motor vehicle that had pulled over,” and the court apparently inferred from that testimony that the officer believed Wright was making an attempt to identify the vehicle or its occupants. That inference from Bordley’s testimony was certainly reasonable.
In building on that initial inference, however, the court evidently relied on its own familiarity with Dorchester and the area’s law enforcement practices to conclude that Wright would have recognized the car as a police cruiser. During the original evidentiary hearing, the trial judge stated that this inference was “drawn from both this case and my presiding over time.” He explained:
[M]y natural inference is that though the police are in those areas in unmarked cars and in plain clothes, the cars are readily identifiable to those people who interest themselves in what the police are driving. And that includes people who are absolutely lawfully about, shopkeepers, people about their business who once have been the victim of a crime or the members of their family [have been] victim[s] of a crime. The police, because they buy in bulk to *217 save money, they’re driving Crown Victorias.[9]
The court’s own knowledge of the common use of Crown Victorias as police cars not only led it to infer that Wright must have recognized the car as a police cruiser, but also led it to infer that Bordley thought that Wright had recognized it as such. The court’s inference about Bordley’s thought process thus depended on its treatment of public recognition of unmarked police cars as a matter appropriate for judicial notice — an approach that I cannot sanction. See Fed.R.Evid. 201(b) (stating that a judicially noticed fact must be either “(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned”). There is no ready means to evaluate the accuracy of the court’s inference, and there is likewise no basis for deeming public recognition of Crown Victorias to be “generally known” in Boston.
Moreover, allowing the district court to rely on its own knowledge, rather than evidence in the record, has the undesirable consequence of preventing the defendant from testing the inference through the adversary process. Indeed, the court’s statement that “the cars are readily identifiable to those people who interest themselves in what the police are driving” does not tell us why the court concluded that Wright in particular — at the time he exited his vehicle — would have been likely to have such knowledge. Cf. United States v. Southard, 700 F.2d 1, 26 (1st Cir.1983) (“It is one thing to take judicial notice of the driving time between New Haven and the Rhode Island line. It is quite another to use this fact as a basis for a finding that the defendant actually knew it.”).
Furthermore, the need for record support for such an inference is implicit in our decision in United States v. Taylor, 511 F.3d 87 (1st Cir.2007), which also involved a motion to suppress a firearm seized during an investigatory stop. There, we rejected the defendant’s claim that the police had seized him at the moment an unmarked Crown Victoria parked behind his vehicle because, among other reasons, there was no evidence that the defendant knew the Crown Victoria was a police car until he recognized one of the officers when the officer approached the defendant’s car. Id. at 92. The District of Columbia Circuit also has flagged the issue, questioning the propriety of crediting a police officer’s testimony that his unmarked car was “one of those ones that everybody knows it’s a police cruiser” in the absence of a factual foundation on “public identification of police vehicles.” United States v. Johnson, 212 F.3d 1313, 1316 (D.C.Cir.2000).
District court judges unquestionably have license to make common-sense judgments about the circumstances surrounding police stops. Such extra-record fact-finding, however, must be limited to background matters that cannot reasonably be disputed. Wright’s knowledge of unmarked police cruisers is not such a matter. I therefore reject as unsupported the court’s inference that Bordley — or any reasonable officer — would have concluded, based on Wright’s leaning forward from *218 the backseat, that Wright had recognized the unmarked cruiser as a police car.[10]
4. The Belief that Wright was Armed
The omission of testimony from the officers is even more troubling with respect to the court’s finding that the officers believed that Wright was armed.[11] This finding involves conduct that is not ordinarily lawful (carrying a concealed weapon), and it goes to the heart of the reasonable suspicion analysis. The officers’ failure to testify to their beliefs about the significance of the conduct that they observed is not a mere technical gap in the evidence. As noted above, the adversary process depends upon the ability of defense counsel to cross-examine witnesses about their observations and the inferences that they drew from them. If, for example, any of the officers here had testified that he suspected Wright of carrying a weapon, defense counsel could have asked why he drew that inference. The officer may have been able to explain why, based on past experience or more detailed observations, he drew the inference. On the other hand, the officer’s response may have revealed that he had no basis for believing that Wright might be carrying a weapon. Cf. Espinoza, 490 F.3d at 47 (noting that the district court, after hearing the arresting officer’s testimony, found that his rationale for following the defendant’s van and commencing an investigation “was bottomed on a pale patina of facts” and that the officer’s actions were “ ‘based on nothing more than a hunch’ ”). Indeed, the evidentiary gap may have occurred because Wright’s hand motion did not in fact cause the officers to suspect that Wright might be carrying a weapon.
*219 Two additional problems also are of critical significance in my assessment of the weapon inference: (1) the court’s reprise of backwards reasoning, and (2) its reliance on the character of the location, despite its finding that the events did not occur in a “high crime area” within the meaning of Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).
a. Backwards Reasoning
In announcing its ruling, the district court acknowledged that the inferences it drew were based in part on the officers’ reaction to Wright: “I draw inculpatory inferences ... from what I infer was the observations of the officers and their response, their immediate order to Mr. Wright to stop.... ” The court’s approach was thus doubly flawed with respect to its inference that the officers believed Wright might possess a weapon. First, the inference was speculative because it lacked support from any testimony from the officers or other evidence (such as evidence of a bulge in Wright’s pocket). Second, the court drew the inference, in part, based on the officers’ reaction. Given that the question in a reasonable suspicion analysis is whether the officers could lawfully take the action they took, their conduct will always support a suspicious inference. The question is whether the defendant’s actions or appearance permitted the inference of suspicious conduct that would justify the officers’ conduct — namely, that Wright might possess a weapon. The court’s inferential process was again impermissibly circular: because the officers ran after Wright and ordered him to stop, they must have thought he could be carrying a weapon. But the officers did not profess such a belief, and neither the officers nor the court cited facts that would support such an inference, apart from references to “that area of Boston.”
b. The Character of the Area
The district court’s analysis suggests that the neighborhood where the events occurred heavily influenced the inference concerning Wright’s possession of a gun. The court twice invoked the location of the arrest in explaining its ruling. First, in drawing the inference that the officers suspected that Wright “might well possess a weapon,” the court stated:
I infer that the officers ascribed some significance as they are competent and experienced police officers in that area of Boston to the fact that Mr. Wright grabbed at his side, clutched at something in his sweatshirt.
Second, in addressing the question of high crime area, the court stated that it was honoring “what I infer is the police officers’ experience and knowledge of the communities which they patrol.” In the latter context, however, the court went on to say that it would have reached the same conclusion on reasonable suspicion “if the officers had acted in the same fashion in Wellesley or Milton”' — locations that the court appeared to contrast with Dorchester because of lower levels of violent crime.
There are troubling inconsistencies in the court’s remarks.[12] The court declined to find that the location was a “high crime area” within the meaning of Wardlow — -a finding that would have given the character of the area significance in the reasonable suspicion inquiry. In explaining that *220 conclusion, the court emphasized that an individual’s behavior, and the overall circumstances surrounding a police stop, must be given the same particularized scrutiny, no matter where they occur, to ensure “that the rights of the citizens in the Dorchester area of Boston [are] identical to the rights of the citizens in Milton and Wellesley.” These remarks reflect the unexceptional principle that residents of poorer urban neighborhoods, where crime typically is more prevalent than in nearby suburban communities, cannot be seen as more likely to be involved in criminal activity simply because of where they live. See Andrew Guthrie Ferguson & Damien Bernache, The “High-Crime Area” Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis, 57 Am. U.L.Rev. 1587, 1589 (2008) [hereinafter The “High-Crime Area” Question ] (noting that the Supreme Court “has never yet allow[ed] the character of the neighborhood to be the sole justification for a stop based on reasonable suspicion”).
Yet, the court’s actual analysis belied this articulation of the law. Despite rejecting the specific high crime area finding, the court factored the officers’ awareness of criminal activity in “that area of Boston” into its assessment of how a reasonable officer would perceive Wright’s “clutching at something in his sweatshirt.” The court apparently concluded that a reasonable officer, knowing the criminal history of the area, would be entitled to think that Wright’s hand movement indicated that he might be carrying a weapon in his pocket.
The government endorses this two-tiered approach to the character of the area, arguing that the prevalence of crime is properly considered even if the location is not found to be “a ‘high crime area’ in the Wardlow sense.” The government, which does not argue on appeal that the court’s Wardlow determination was incorrect, stresses that the stop occurred in a location that the officers on the scene nevertheless associated with assorted crimes. It contends that their perception — supported by their testimony at the suppression hearing[13] — should be given weight in evaluating their response to Wright’s behavior.
The government’s argument has large implications. In our earlier decision in this case, we observed that the evidence relevant to a high crime area finding ordinarily should include some combination of factors showing a link between the incidence of specific criminal activity in the area and the police officers’ suspicions about the defendant. After all, the reasonable suspicion justifying a Terry stop must be more than an “inchoate and unparticularized suspicion or ‘hunch,’ ” Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and it must be specifically focused on the individual under scrutiny. When the officers have specific background knowledge about that individual, they are able to view his conduct in light of their prior information. In United States v. Am, for example, we deemed the location of a Terry stop a permissible consideration in a firearms case where the officers knew enough about the history of the defendant to conclude reasonably that he *221 would be unlikely to walk unaccompanied in that area — known for gang violence— unless he were armed. See 564 F.3d 25, 28 (1st Cir.2009).
Where the officers have no personal knowledge of the defendant, however, the relevance of any background knowledge— including the character of the neighborhood — logically depends on whether it contributes to particularized suspicion concerning the individual under observation. A high incidence of crime in an area may provide such a link when the evidence establishes a similarity between the crimes that most commonly occur there and the crime suspected in the instant case. See United States v. Wright, 485 F.3d 45, 54 (1st Cir.2007) (“Wright I”) (requiring a “nexus” between the crime prevalent in the area and the crime suspected). The strength of that link will turn, inter alia, on both temporal proximity — how recently did such prior, similar crimes occur? — and whether the geographic boundaries of the “area” or “neighborhood” under scrutiny are limited. Id.
Such factors bring discipline to the high crime area designation by establishing limiting principles that will assure, in the district court’s words, “scrupulously identical” constitutional protection for residents of crime-ridden neighborhoods as for other individuals, guarding against detentions rooted only in generalized perceptions. The factors link a neighborhood’s experience with crime to the defendant’s observed conduct and thus give substance to the requirement of particularized suspicion. A police officer who knows that crimes of a certain type have recently been occurring in a sensibly circumscribed area could expect more such crimes there, reasonably increasing the officer’s suspicions about conduct suggestive of such a crime. Without a link to recent similar crimes, however, there would be less reason to treat equivocal conduct as suspicious — and more risk of an unjustified stop. See Johnson v. Campbell, 332 F.3d 199, 210 (3d Cir.2003) (“[Wjhen a stop is not based on specific, objective criteria, ‘the risk of arbitrary and abusive police practices exceeds tolerable limits.’ ” (quoting Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979))).
Establishing a link between the defendant’s observed conduct and the high crime area designation is essential in protecting individual rights because of the decisive impact of that designation in the reasonable suspicion calculus. When it applies, every observed act is viewed through a more suspicious lens, and commentators have observed that “a high-crime area designation almost always shifts the analytical balance toward a finding of reasonable suspicion.” The “High-Crime Area’’ Question, 57 Am. U.L.Rev. at 1590. This weighting is appropriate only if the designation in fact “makes an officer’s ‘suspicion’ about otherwise innocent conduct in that area more reasonable.” Id. at 1635.
Such a particularized focus in the high crime area designation was implicit in Wardlow, where the defendant was arrested for drug activity. The Supreme Court noted that the officers were “converging on an area known for heavy narcotics trafficking in order to investigate drug transactions,” and they were traveling in a four-car caravan “because they expected to find a crowd of people in the area, including lookouts and customers.” 528 U.S. at 121, 120 S.Ct. 673. The law enforcement focus was thus directed toward current and ongoing drug trafficking. Wardlow was observed standing next to a building holding an opaque bag, and he fled after looking in the direction of the officers. Id. at 121-22, 120 S.Ct. 673. The officers suspected Wardlow of narcotics activity — the very crime the officers expected to find in the area. See id. at 122, 120 S.Ct. 673 (noting that officer conducted a protective weap *222 ons search “because in his experience it was common for there to be weapons in the near vicinity of narcotics transactions”).
In rejecting the high-crime area characterization for the area of Blue Hill Avenue where Wright was stopped, the district court necessarily concluded that the requisite links between the area’s criminal history and Wright’s observed conduct were missing. I discern no clear error in that conclusion. Unlike in Wardlow, the officers here were not responding to specific reports of recent crimes. Officer Bordley testified that they were not heading toward a specific location, but “just happened to be in the Mattapan area [of Dorchester] at the time.” Officer Celester said he and his colleagues had no special instructions that evening and were in the area to do “proactive policing” and to “aggressively patrol areas, targeting gangs and things like that.” [14]
As noted, the officers did testify to their recurring experiences with crime in the area. Bordley stated that he went to the vicinity of the 1200 block of Blue Hill Avenue at least once during each shift he worked and that he had made fifty or sixty arrests in that area for various crimes, including drug offenses and assault and batteries. He also had encountered “a couple of shootings” there. He did not say when those arrests and shootings occurred, however, and he had no specific recollection of the type of arrests he or any members of his task force had made in October and early November 2004.[15]
The empirical evidence in the record also fails to connect the officers’ general perceptions about high levels of crime in the area to the specific time and location of Wright’s arrest, or show that firearms crimes were of particular concern during that period. Defense counsel requested incident reports from the Boston Police Department for all violent crimes involving a firearm that occurred in October and early November 2004 within 1,000 feet of the location of Wright’s arrest. Thirteen incidents were listed, but the ten available reports showed only two episodes (on October 12 and October 19) in which armed individuals had threatened random individuals on the street.[16] In addition, although the Department typically prepared biweekly reports and maps showing “hot spots” throughout the city,[17] no statistics *223 and maps were generated between August 31 and November 8 — the date of Wright’s arrest — because the format of the Department’s data collection was being revamped during that period. Defense counsel reported in an affidavit that the two most recent such reports, from August 2004, showed that the nearest hot spots were 1.5 and more than 2 miles from the Blue Hill Avenue location of Wright’s arrest.
In its post-remand memorandum to the district court, the government asserted that the reasonableness of the officers’ perception of the location as a high crime area was “not significantly undercut” by the crime reports offered by the defendant as evidence that “the actual incidence of crime in this area was not particularly high.” The government noted that the officers “relied on their extensive experience and a longer history of information collected from the area in drawing the conclusion that the neighborhood had experienced a high incidence of crime.”
A generalized notion of the area’s criminal history does not, however, establish any of the factors that we cited as pertinent in considering whether a neighborhood is a “high crime area” such that it should be given weight in the reasonable suspicion calculus. When recent crimes of a particular type have occurred in a reasonably circumscribed area in proximity to where an individual is seen exhibiting conduct suggestive of that type of crime, the location is relevant in interpreting that individual’s conduct. The individual’s conduct is reasonably viewed more suspiciously because it mirrors particular criminal conduct that the observing police officers have reason to expect will recur in that specific location.
By contrast, the catalog of crimes reported by the officers in this case, drawn from their experiences over the years patrolling in Dorchester, provides no link between any particular crime the officers had reason to anticipate and Wright’s observable conduct. Many innocent acts can be construed as suggestive of some kind of crime. If it were enough for purposes of the Fourth Amendment reasonable suspicion analysis that crimes of various types had regularly occurred along that stretch of Blue Hill Avenue, virtually every act by every individual in the neighborhood would be subject to heightened scrutiny and suspicion — a state of affairs inconsistent with the principle of particularized suspicion. See generally The “Highr-Cñme Area” Question, 57 Am. U.L.Rev. at 1628-31 (observing that, “[t]o alter fundamental Fourth Amendment protections, it would seem necessary that the area really be qualitatively different,” and proposing “an objective, quantifiable approach” that would include “a geographic and temporal limitation”). On this record, therefore, the district court supportably concluded that the government’s evidence fell short of showing the links necessary to characterize the location of Wright’s arrest as a high crime area under Wardlow.
If, as the government urges, we were to consider the general character of an area in the reasonable suspicion inquiry notwithstanding a failure of proof on the high crime area designation, we would be allowing anecdotal characterizations of an area’s criminal history to overwhelm the particularized analysis that provides protection against arbitrary police conduct. If the government is unable to persuade the district court that a location warrants the high crime area designation in the relevant sense, the officers’ generalized perceptions of “high crime” cannot supplant the deficiencies in evidence underlying the rejection of the high crime area designation— here, the absence of a proven nexus, at the relevant time, “between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case,” Wñght I, 485 F.3d at 53-54.
*224 I realize that it is tempting, in evaluating the reasonableness of police officers’ actions, to acknowledge and give weight to their general knowledge that an area is dangerous, even without the more formal high crime area finding. Certainly, it is unrealistic to think that police officers, or any reasonable person, would be unaffected by the fact that crimes of various types have regularly occurred in an area where they are walking or driving. Nonetheless, if “a generic fear of what might happen in a high-crime area” were enough to trigger the high crime area factor in a reasonable suspicion inquiry, United States v. Martins, 413 F.3d 139, 150 (1st Cir.2005), without any specific expectation of criminal activity to focus law enforcement attention, the protections afforded by the Constitution would too often be compromised for the poor and minorities, who historically have comprised “ ‘almost all of the population in most of the neighborhoods the police regard as high crime areas.’ ” Montero-Camargo, 208 F.3d at 1138 n. 31 (quoting David A. Harris, Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked, 69 Ind. L.J. 659, 677 (1994)); see also United States v. Caruthers, 458 F.3d 459, 467 (6th Cir.2006) (“[L]abeling an area ‘high-crime’ raises special concerns of racial, ethnic, and socioeconomic profiling.”).
The Fourth Amendment thus requires law enforcement officers to resist the stereotypes associated with bad neighborhoods and to ground their suspicion in “ ‘specific and articulable facts.’ ” Espinoza, 490 F.3d at 47. Indeed, the danger in giving weight to police officers’ general perceptions of an area, in the absence of a high crime area finding, is starkly illustrated by the court’s conclusion that the officers here inferred that Wright might be carrying a gun. The district court invoked the officers’ experience and knowledge “in that area of Boston” to draw an inference on behalf of the officers that is otherwise without any factual foundation. But the general awareness that crimes of various types regularly occur in Dorchester cannot transform an ordinary movement — securing an item in one’s pocket while running — into a suspicious act. See United States v. McKoy, 428 F.3d 38, 41 (1st Cir.2005) (“It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car’s console when approached by police, even in a high-crime neighborhood.”). In this case, therefore, the officers’ general knowledge of crime in Dorchester is not an appropriate element of the reasonable suspicion inquiry.
c. Conclusion on the Belief that Wright was Armed
Excluding the court’s improper consideration of the location, and absent testimony indicating that Wright’s conduct or appearance would suggest to a reasonable officer that he had a gun in his pocket, the court’s finding that the officers inferred that Wright might be armed is unsupportable. The record tells us only that the officers saw Wright clutching at his sweatshirt, near his waist, as he ran. The district court thus lacked a sufficient evidentiary basis to infer that a reasonable officer would believe that Wright might be carrying a weapon.[18]
*225 B. Summary of Unsupported Facts and Inferences
My examination of the historical facts and inferences underlying the district court’s analysis has thus revealed multiple flaws: (1) the impermissible reliance on the court’s own professed knowledge that the police drive Crown Victorias to infer that Officer Bordley thought Wright, upon leaning forward, had identified the unmarked cruiser as a police car, (2) the lack of testimonial support for the court’s pivotal inference that the officers believed Wright might be carrying a weapon, (3) reliance on the officers’ general perceptions of “that area of Boston,” and (4) factoring the officers’ response to Wright’s conduct into the calculus. These problems do not, however, necessarily prevent a reviewing court from reaching the same conclusion as the district court about reasonable suspicion based on an independent review of the supportable historical facts and inferences. Hence, I now turn to that inquiry.[19]
II.
This case is so difficult because it is hard to resist looking at the events through the lens of their eventual outcome, despite the principle that a seizure cannot be justified by its results. From our present vantage point, it appears that Wright almost certainly was fleeing from the police to avoid being found with a gun that he possessed unlawfully. See McKoy, 402 F.Supp.2d at 316 (“[I]t is difficult [for courts] to conclude it was objectively unreasonable for the officers to believe a suspect was armed when in fact he was.).” That reality expressly crept into the district court’s original ruling on the suppression motion, causing the court to reason backwards from the discovery of the gun in assessing the officers’ conduct. Indeed, remnants of that improper reasoning contributed to the court’s willingness on remand to infer that the officers believed Wright had a weapon, even without testimony from the officers that they possessed such a belief or any evidence that the item in Wright’s pocket was a gun rather than something else.
In the Fourth Amendment context, however] it is critically important that we not *226 allow the ends to justify the means. I have therefore been exacting in my review of the evidence underlying the district court’s ruling to prevent the knowledge of the weapon he was carrying from influencing my view of the behavior that preceded its discovery.
I thus turn to the totality of the circumstances supported by the record to consider de novo whether the officers had a reasonable suspicion justifying their decision to detain Wright. Given the gaps in the record and the resulting defects in the district court’s findings, the facts that are properly considered are limited. Like the majority, I do not treat the location of the stop as a high crime area for purposes of my inquiry. Unlike the majority, I cannot rely on a reasonable officer’s having inferred, at the time Wright exited his vehicle, that he recognized the police cruiser as such. Nor may I infer that a reasonable police officer would have suspected, based on Wright’s clutching motion, that he was carrying a gun. The circumstances that may be considered thus consist of four historical facts: (1) Wright leaned forward from the backseat of the car in which he was a passenger to try to identify the occupants of the vehicle parked in front of him; (2) he then quickly exited his car and ran down the street; (3) he clutched at the pocket of his sweatshirt as he ran, and (4) when the officers shouted at him to stop, identifying themselves as police officers, he continued on his way up Blue Hill Avenue.[20]
I therefore proceed to look at each of these acts chronologically, reviewing Wright’s actions in sequence as the police officers would have encountered them, before considering their significance in combination.
A. Leaning Forward from the Back Seat
Wright’s leaning forward in the car is not suspicious conduct. Checking out the occupants of a car that has stopped near one’s own is an everyday act that by itself is not suggestive of criminal conduct.
B. Running Down the Street
The district court explicitly resisted using the word “flee” to describe Wright’s initial running from the car, accentuating that when Wright started to run, the running was not yet flight.[21] The court thus implicitly found that Wright’s departure lacked any characteristic that would permit a reasonable officer to conclude that he was running from the officers rather than to a pre-planned destination. The government has not challenged this “no flight” finding, and it is a supportable view of the ambiguous circumstances described by the officers.[22]
*227 Wright’s car had come to a stop in front of the mini-mart before the police car pulled over, and Wright emerged from his vehicle and started to run before the officers made any attempt to approach him. I have already shown that the record lacks support for a finding that Wright knew that Boston police officers use Crown Victorias as unmarked cruisers, and none of the officers testified to conduct by Wright suggesting that he ran from the car because he recognized them as police officers. They did not describe his exit from the vehicle as unusual, unexpected, or otherwise seemingly designed to elude them.[23] Wright then proceeded straight up the street, and the officers were able to catch up to him within seconds.
Running away, rather than walking, makes Wright’s departure potentially more suspicious. See Caruthers, 458 F.3d at 466 (“ ‘[T]he speed of the suspect’s movements may be relevant in the totality of the circumstances’ ”) (quoting United States v. Gordon, 231 F.3d 750, 757 (11th Cir.2000)). Running is reasonably seen as “flight,” however, only when other factors permit the conclusion that the runner is acting in an unexpected or unconventional way, or in response to police presence. See Wardlow, 528 U.S. at 125, 120 S.Ct. 673 (“Flight, by its very nature, is not ‘going about one’s business’; in fact, it is just the opposite.”).
Here, Wright’s behavior — exiting a newly parked car and following a straight path up the main street — was fully consistent with “ ‘going about [his] business.’ ” Indeed, Wright points out that he ran toward the three other unmarked cruisers in the caravan.[24] Moreover, his running was unaccompanied by other circumstances that have been associated with flight, such as an abrupt change in behavior, a suspicious utterance, or an odd or indirect path. Cf. Wardlow, 528 U.S. at 122, 120 S.Ct. 673 (describing defendant’s path “through the gangway and an alley”); United States v. Lawshea, 461 F.3d 857, 859-60 (7th Cir.2006) (stating that defendant “not only ran away from the officer, but he sprinted around the same building three times”); Aitoro, 446 F.3d at 249 (recounting that defendant or his companion exclaimed “ ‘Oh shit’ ” after recognizing officers and then “ ‘did an abrupt about-face and sprinted in the reverse direction’ ”); United States v. Franklin, 323 F.3d 1298, 1302 (11th Cir.2003) (noting that defendant’s flight was “particularly suspicious because of its nature and duration,” where defendant “ran away at full speed as soon as he saw the officers” and “ran behind [a] building, climbed a fence, sprinted across a parking lot and began to scale a second *228 fence”); United States v. Harris, 218 Fed.Appx. 525, 528 (7th Cir.2007) (unpublished) (reporting that, when defendant spotted a marked police cruiser, he “did an immediate and abrupt about-face and walked across a muddy yard despite an available and cleaner alternative route”).
I thus accept the district court’s implicit finding that a reasonable officer would not have concluded that Wright was fleeing from the officers when they saw him run from the car.
C. Clutching at the Sweatshirt
As I have recounted, there is no basis in the record for inferring that Wright’s clutching at his sweatshirt was anything more than the natural motion of a runner seeking to protect an item in his pocket from slipping out.
D. Refusing to Stop
Unquestionably, Wright’s disregard of the officers’ order to stop is suspicious. Although an individual approached by an officer who lacks reasonable suspicion of criminal activity may ignore the police and go about his business, Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), we would ordinarily expect individuals with nothing to hide to comply with direct police requests to stop, if for no other reason than to dispel suspicion. Wright’s refusal to stop makes it virtually inevitable that the pursuing officers would believe — reasonably—that he had been deliberately running from them when he exited his car, and was not merely departing quickly for a previously scheduled rendezvous somewhere on Blue Hill Avenue.
Nonetheless, I am not prepared to conclude that reasonable suspicion is automatically established whenever an individual fails to heed a police officer’s command to stop running. In this instance, only seconds had passed from the time Wright started running until he was caught.[25] If the order to stop was Wright’s first notice that the officers were focused on him — and the record does not show otherwise — he had almost no time to process their demand and consider his response before the officers tackled him. In my view, reasonable suspicion does not arise from the mere fact that a young man running down the street fails to come to a sudden halt when police officers unexpectedly order him to do so.
However, neither Wright’s refusal to stop nor his other behaviors may be considered in isolation. I therefore turn to an assessment of the circumstances as a whole. See United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (noting that the factors must not be considered “in isolation from each other”); Ruidiaz, 529 F.3d at 30 (noting that “a fact that is innocuous in itself may in combination with other innocuous facts take on added significance”).
E. Totality of the Circumstances
My discussion makes it apparent that, up to the point the officers directly engaged Wright by ordering him to stop, a reasonable police officer would not have suspected that criminal activity was afoot. Although the government asserts that Wright’s running and clutching — after he had leaned forward to look at the Crown Victoria — was enough to justify the stop, those two actions, on this record, were ordinary for the circumstances. Wright exited a parked ear immediately after looking at the vehicle that pulled over in front of him and ran up the street, grabbing at his pocket as would any runner seeking to secure an item as he ran. Even *229 in combination, these behaviors do not provide a “particularized” basis for suspecting Wright of criminal activity.
I thus must consider whether Wright’s failure to stop in response to the police order, considered together with his earlier actions, gave rise to reasonable suspicion. The question is close. Certainly, the refusal to stop cast Wright’s earlier running in a new light, permitting a reasonable police officer to infer at that point that Wright had run off initially because he realized the occupants of the Crown Victoria were law enforcement officers. Critically, however, nothing in the record would permit a reasonable officer, even in retrospect, to conclude that Wright’s otherwise innocent motion in clutching his sweatshirt suggested he might have a gun or other contraband in his pocket. One can accept such a conclusion only by giving in to stereotypes and adopting a sinister explanation for Wright’s behavior — i.e., that a twenty-five-year-old man refusing to stop for the police in “that area” is likely to be involved in violent conduct or drug activity, leading to the inference that he might have a gun or narcotics in his pocket. That logic, for reasons I have explored at length, is impermissible. The only suggestive behaviors remaining, therefore, are Wright’s initial running and his later refusal to stop.
In these particular circumstances, that is simply not enough. Wright was in an area where “aggressive patrolling” by the police was routine; indeed, in its original ruling, the district court found that the officers intended “to get out of their cruiser, make inquiry of the Wright vehicle, if not of other people, lawfully but aggressively to find out where they were going and what they were doing.” In that context, Wright’s possible decision to run off to avoid an encounter with the police tells us little; innocent individuals would also be highly motivated to avoid such an intrusion. See generally Wardlow, 528 U.S. at 132, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part) (“Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer’s sudden presence.”); id. at 133, 120 S.Ct. 673 (noting that “these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices”); Amy D. Ronner, Fleeing While Black: The Fourth Amendment Apartheid, 32 Colum. Hum. Rts. L.Rev. 383, 396 (2001) (“Because minorities and residents of high crime areas are popular targets of police abuse, they are also the ones most prone to run at the mere sight of the police.”).
As I have described, Wright’s running throughout the incident lacked suspicious characteristics — it began at a natural point for departure, when he exited a vehicle; he ran directly down a main street, and the officers reported no furtive gestures or exclamations when he began to run; his continued running in the face of an order to stop lasted for only moments before he was apprehended. It is possible, of course, that Wright’s behavior would have become more suspicious if the pursuit had continued,[26] and he had used more evasive *230 tactics to get away from the officers. But those are not the facts we have here.
I recognize that reasonable suspicion is not defeated by the possibility that the conduct observed was innocent. See Wardlow, 528 U.S. at-125-26, 120 S.Ct. 673. Mere possibility, however, is also not enough to establish reasonable suspicion. See United States v. Urrieta, 520 F.3d 569, 578 (6th Cir.2008) (“The Fourth Amendment simply does not allow a detention based on an officer’s ‘gut feeling’ that a suspect is up to no good.”). The facts before us do not depict accumulating circumstances that, in totality, support a reasonable suspicion that Wright possessed a gun or other contraband, but show instead a consistent course of conduct that, even taken as a whole, strengthens only the inference that Wright did not want to interact with the police. See United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (“[A]n assessment of the whole picture must yield a particularized suspicion .... ”); cf. Wardlow, 528 U.S. at 130 n. 4, 120 S.Ct. 673 (noting that, in Terry, “reasonable suspicion was supported by a concatenation of acts, each innocent when viewed in isolation, that when considered collectively amounted to extremely suspicious behavior”) (Stevens, J., concurring in part and dissenting in part).
Our reasonable suspicion analysis in Aitoro provides a helpful contrast, showing the deficiencies in the evidence here. In that case, a number of officers — more than five — had positioned themselves in an area “ ‘with frequent street-level drug selling activity.’ ” 446 F.3d at 249. Defendant Aitoro was arrested after he and another man abruptly reversed direction and sprinted off when they saw three police officers get out of their car. Aitoro sought to distinguish his case from Wardlow by pointing out that the police in Wardlow “were specifically on the lookout for drug-purchasing customers and scouts for drug traffickers looking for approaching police,” and that Wardlow was seen carrying a bag that made him “a particular target for suspicion.” Id. at 253. We concluded, however, that two significant facts “gave the police at least as much additional basis for suspicion” that Aitoro was involved in drug trafficking as the defendant’s bag gave to the police in Wardlow: the exclamation of “Oh shit” by Aitoro and an officer’s sighting of a bulge at Aitoro’s waist that he thought was a gun. Id.
Here, we have no facts that are inferentially revealing of criminal activity — such as the exclamation or the bulge — and Wright’s running is ambiguous in context. The gap between Wright’s refusal to obey the police order to stop and a supportable finding of reasonable suspicion would perhaps be bridged if the officers had testified to their rationale, arising from their expertise, for responding as they did to the behaviors they saw. Little more is necessary in this case to cross the threshold from hunch to reasonable suspicion. As I have noted, the analysis would be different if the officers had described some characteristic of Wright’s pocket or other evidence that would support the belief of a reasonable officer that he was carrying a gun or other contraband. Without such evidence, however, Wright’s running failed to blossom into anything more sinister than an attempt to avoid the officers — a perfectly lawful and, in context, predictable course of action.
That so little substantiation might redeem the government’s case does not render the redemption unnecessary or pointless. If the government is forced to make explicit the basis for the officers’ reactions, including why they might be suspicious of conduct that otherwise appears innocent, the defense can challenge that testimony and the truth-seeking purpose of the ad *231 versary process can work. But if the constitutional determination of reasonable suspicion rests on unsupported inferences, judicially noticed facts, vague references to experience or a general pattern of crime in the area, the constitutional analysis becomes little more than a means of justifying a search or seizure on the basis of its result.
“[W]e are cognizant of the important role that the police play in keeping our citizens safe, and we do not lightly second guess the decisions made by police officers in the field.... ” Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir.2003). At the same time, however, we have an obligation to take seriously the constitutional principles that protect individuals from unwarranted law enforcement intervention. The real test of our commitment to those fundamental principles occurs when we are asked to apply them in close cases. Here, I are compelled to conclude that the deficiencies in the district court’s finding of reasonable suspicion are not offset by the totality of the remaining circumstances. In sum, I cannot identify “ ‘specific and articulable’ ” facts and inferences that are sufficiently grounded in Wright’s conduct to anchor a finding of reasonable suspicion. Accordingly, unlike the majority, I would reverse the district court’s denial of Wright’s motion to suppress and remand for entry of an order granting the motion.

. In the original hearing, the court had stated that, when Wright leaned forward, "he saw that it was an unmarked police officer[sic], he knowledgeably recognized it as such.” During the remand hearing, the court did not explicitly attribute this knowledge to Wright, instead referring only to the inference drawn by Bordley. The court also did not repeat the common-knowledge explanation to support its finding on Bordley's inference. I think it is a fair assumption that it relied on the same rationale, however, because the record contained no new evidence.

. The majority ignores the lack of factual support for the court’s conclusion that Wright identified the Crown Victoria as a police cruiser. Instead, it offers its own flawed speculation, concluding that a reasonable officer could have inferred that Wright "made” the car based on his quickly exiting the vehicle in which he was riding. But the critical factual question that makes Wright's identification of the police car relevant is whether Wright quickly exited and ran because he saw the police officers — making his quick exit from the car and his run down the street suspicious. His running, then, cannot be the basis for the conclusion that he recognized the car as a police vehicle. Such reasoning is circular and unsupportable. In addition, I do not understand how the majority can equate the quick exit from the car — conduct that itself reflects no state of mind — with the revealing exclamation "oh shit” in supporting an inference that Wright was running from the police.
The majority’s strained suggestion that Wright could have recognized the officers because they always wore badges or police department shirts is also unpersuasive. Wright was sitting in the back seat of a car that was behind the car he leaned forward to see. It was 7:45 p.m. in November — undoubtedly after dark. Even if the officers were wearing badges any inference that Wright saw them is unsupported and unreasonable on this record.
Finally, the majority creatively speculates not only that the officers reasonably could have believed that Omar Edwards recognized Officer Brown as a police officer, but also that he communicated that information to Wright. Many scenarios are possible, of course, but there is no factual support for such speculation. An appeals court cannot simply make up inferences to fill in the gaps in the record. Moreover, none of these arguments was made by the government.

. The district court explained its inference that the officers who saw Wright run down Blue Hill Avenue believed he might have a gun as follows:
The Court infers, and again the testimony is what it is, it’s not explicit, I infer that the officers ascribed some significance as they are competent and experienced police officers in that area of Boston to the fact that Mr. Wright grabbed his side, clutched at something in his sweatshirt. The Court infers that the officers did in that split second draw the inference that he might well possess a weapon.

. Rather than confronting these inconsistencies and the district court's clear reliance on the nature of the area — as well as the government's argument that the court properly did so — the majority chooses to ignore the problem and read the court's reference to "that area of Boston" as “an appeal to the expertise of the officers.” In my view, this convenient recasting of the record is an unsupportable reading of the court's words and a regrettable avoidance of one of the most troubling aspects of the district court’s decision.

. Officer Bordley staled that the neighborhood around the 1200 block of Blue Hill Avenue has a "level of criminal activity [that] would be considered high for that area,” with "[n]umerous arrests for drug offenses, violent crimes, violent assaults, assaults and batteries, firearms arrests, things of that nature.” Officer Celester testified that "we were experiencing a lot of crime ... during that period, so we were doing a lot of proactive policing” and said the officers would "aggressively patrol areas, targeting gangs and things like that.” Officer Brown testified that he had responded to "several shootings [and] drug investigations in that area.”

. Bordley testified that there was a high volume of drug trafficking in that area at the time, but he had no memory of whether he or other officers had made any arrests for such crimes during October and early November 2004.

. The prosecutor asked Bordley if he had made arrests in that area “before” — presumably meaning “before” Wright’s arrest. Bordley replied that he had made fifty or sixty arrests in the area for a variety of crimes and had "[b]een in that area where there were a couple of shootings.” Bordley had been with the Boston Police Department for eleven years by the time of the suppression hearing, and he had been assigned to the Youth Violence Task Force for approximately five years. It is a fair inference that he was summarizing events that occurred throughout his time on the force.

. Of the ten listed incidents for which reports were available, the only additional incident clearly involving a firearm stemmed from a personal dispute among co-workers at a Home Depot store. Two other reports described firearms incidents outside the 1,000-foot range, and the remaining reports described incidents in which the original firearm information was not confirmed when the officers went to the scene. One of the incidents for which a report was unavailable was described as an assault with a dangerous weapon.

. Bordley explained that "by the map you could tell what crimes occurred in what area, and you could tell which area had the more crimes ... by the number of hits that were happening ... in that place.”

. The majority agrees that the district court improperly drew the inference that the officers would have believed that Wright was carrying a gun. In yet another revision of the district court’s opinion, the majority nonetheless holds that the court could have reasonably concluded that a reasonable officer would have believed that Wright was carrying contraband based on the same innocent motion of clutching at his pocket while running. It relies solely on its own finding of flight to reach that conclusion. The record, however, can no more be read to support an inference that Wright was carrying contraband than that he was carrying a gun, rather than, in the *225 majority’s words, “something else that is frequently kept in pockets, such as keys.”

. As I describe, the majority has bolstered its reasonable suspicion analysis by taking a number of liberties with the record and the district court’s explanation of its decision:
(1) where the district court improperly framed its inferences in subjective terms, the majority recasts them as imperfectly expressed objective findings, see supra § 1.A.2;
(2) in addressing the court’s finding that Wright recognized the car in front of him as a police vehicle, the majority ignores the district judge’s reliance on his own background knowledge of Crown Victorias and instead supplies multiple other rationales not argued by the government and not supported by the record, see supra n. 2;
(3) where the district court specifically said that Wright was not fleeing when he first exited the vehicle in which he was riding, the majority concludes that the court either did not mean what it said or committed clear error, see infra n. 14;
(4) the majority entirely ignores the district court's unmistakable reliance on the nature of the area as support for its conclusion of reasonable suspicion, see supra n. 4;
(5) the majority concludes that the presence of Omar Edwards in the vehicle with Wright was both irrelevant and relevant, see infra n. 12; and
(6) the majority concludes that the district court clearly erred in finding that the officers reasonably could have believed Wright was carrying a gun, but goes on — without any ■support — to find a basis for believing that Wright had contraband in his pocket, see supra n. 10.
Given its unusual approach to the record and the district court's decision, the majority’s different outcome is unsurprising.

. As the majority points out, the government also cites as a relevant fact Officer Brown’s recognition of Omar Edwards, a recent shooting victim, as the front-seat passenger in the car in which Wright had been sitting. Like the majority, I fail to see how Edwards’ injury at some unspecified time in the past, with no connection to Wright, could contribute to a finding of reasonable suspicion that Wright was involved in unlawful activity on the night he was seized. The majority goes on to make the cryptic statement that, despite this irrelevance, Edwards’ presence was not entirely irrelevant. I have no idea what that means, and I see no way in which the officers’ focus on Brown or the vehicle plays a part in the reasonable suspicion inquiry.

. The court stated:
I infer from the testimony that, though things happened in split second intervals, Mr. Wright had started to run, I do not at this point say flee, he had started to run before the officers had started to run after him.

. Despite the government’s failure to challenge the finding, the majority concludes that the district court either did not find "no flight" or that any such finding was clearly erroneous. The majority relies, in part, on the unsupported inference that Wright "made” the lead car in the caravan. The district court, however, rejected characterizing Wright's running as flight despite its find *227 ing that Wright would have identified the Crown Victoria as a police vehicle. As I explain, the court reasonably found that the officers could not at this juncture infer that Wright was fleeing, and the majority may not reject that finding simply because it disagrees with it.

. Officer Brown testified that as soon as Wright exited the vehicle, he "turned to his right, grabbed onto his hooded sweatshirt pocket right about here and began to run up Blue Hill Avenue.” He later elaborated: "It was real quick. It was just he gets out, he looks to his left, grabbed his jacket pocket and he proceeds to run up Blue Hill Avenue.” Officer Celester testified that, as the first car in the four-car caravan either "stopped or drove by” Wright’s vehicle, "the rear passenger jumped out and ran.” Officer Bordley’s testimony was similar: "That occupant that was in the rear seat ended up getting out of the rear seat, stepped out of the motor vehicle, grabbed the right side of his sweater and took off running up Blue Hill Avenue in the direction of Clarkwood Street.”

. I agree with the majority that Wright’s running toward the other cars "does not defeat a finding of flight.” It diminishes, however, the significance of his running away from the lead car.

. Officer Bordley testified that Wright ran a total of about fifty or sixty feet from the car in which he had been riding to where he was stopped.

. Although not part of the district court’s findings of fact, Bordley testified that one officer (he thought it was Officer Foley) had exited his car and "tried to grab" Wright as he passed, and that "it slowed [Wright] up just enough so I was able to catch up to him and grab him.” This testimony does not tell us whether Foley’s action caused Wright to alter his course or how it "slowed him up.” Given the short span of the entire episode, it appears that Foley's action may have occurred almost simultaneously with the stop.