*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-529

BRANDON D. GOLDEN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-8438-15)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued December 3, 2019                    Decided April 15, 2021)

*Claire Pavlovic*, Public Defender Service, with whom *Alice Wang* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Matthew R. Palmer-Ball*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and MCLEESE, *Associate Judges*.

GLICKMAN, *Associate Judge*: Brandon Golden appeals his convictions for carrying a pistol without a license (CPWL),[1] possession of an unregistered firearm (UF),[2] and unlawful possession of ammunition (UA).[3] Mr. Golden argues that the trial court should have granted his motion to suppress the physical evidence supporting these charges — the gun and ammunition — because the police recovered that evidence from him by conducting an unreasonable stop and frisk in violation of his Fourth Amendment rights. We agree. We hold that the police (1) unconstitutionally *seized* Mr. Golden by confronting him on the street, subjecting him to accusatory questioning, and asking him to expose his waistband for visual inspection, all without a reasonable basis to suspect him of criminal activity; and (2) unconstitutionally *searched* Mr. Golden by then frisking him for a weapon without an objectively reasonable basis to suspect he was armed and dangerous. Accordingly, and without reaching Mr. Golden's other claims of error at his trial, we vacate his convictions.

---

[1] In violation of D.C. Code § 22-4504(a) (2020 Supp.).

[2] In violation of D.C. Code § 7-2502.01(a) (2018 Repl.).

[3] In violation of D.C. Code § 7-2506.01(3) (2018 Repl.).

## I.     The Stop and Frisk[4]

The charges in this case arose from Mr. Golden's street encounter with members of the Metropolitan Police Department's Gun Recovery Unit (GRU).  On the night of June 22, 2015, at about 9:41 p.m., Mr. Golden was walking by himself down Southern Avenue and approaching the intersection with South Capitol Street.  At that same time, four GRU officers who were on patrol together in a pair of unmarked SUVs were also travelling down Southern Avenue.  As they neared South Capitol Street, the driver of the lead SUV, Officer John Wright, pointed out Mr. Golden (by saying "the guy on the right") to his partner, Officer Patrick Vaillancourt.  The record is silent as to why Officer Wright called attention to Mr. Golden; there was no lookout and the record contains no evidence that Mr. Golden was doing anything noticeably illegal or suspicious.[5]  Nonetheless, Officer Wright then made a right turn onto South Capitol Street and stopped his car at the curb, directly in front

---

[4]  Our account of the stop and frisk is based on the testimony of the arresting officers (primarily Officer Patrick Vaillancourt, the sole witness at the suppression hearing, and Officer Sherman Anderson, who testified at trial) that the trial judge credited in denying Mr. Golden's motion for suppression, both initially and on reconsideration in light of testimony adduced at trial.  Mr. Golden presented no contrary testimony.

[5]  Neither party called Officer Wright as a witness.

of Mr. Golden and just before he was about to reach it.  Officer Vaillancourt estimated that their vehicle was ten to twenty feet away from Mr. Golden at this time.  Simultaneously, the driver of the second police vehicle, Officer Sherman Anderson, pulled up to the curb on Southern Avenue and stopped in a position perpendicular to Officer Wright and Officer Vaillancourt's vehicle, an estimated seventeen feet to Mr. Golden's left.[6]

After stopping, the officers remained seated in their cars with their windows down.  The officers all wore tactical vests that displayed their badges and were marked "POLICE" in large, bright yellow lettering.  They carried guns in their holsters.  As Officer Vaillancourt testified, Mr. Golden noticed the officers confronting him and abruptly "froze," appearing "surprised" and "nervous."  There were a few people in a parking lot behind Mr. Golden; they quickly dispersed.  There is no indication in the record that any other persons were on foot in the vicinity.

Mr. Golden was wearing a short-sleeved orange polo shirt, with a sweatshirt tied over it around his waist.  Officer Vaillancourt testified that he found the

---

[6] At trial, Officer Anderson recalled that he "would have" activated his SUV's flashing emergency lights when he stopped so that cars traveling very fast on Southern Avenue would not rear end him.

sweatshirt "sort of strange," because "it was warm out and [the officer didn't] really think there would be any need for a sweatshirt at that point." After turning onto South Capitol Street, Officer Vaillancourt saw "a bulging object" of some kind on Mr. Golden's right hip under his orange shirt. The officer said he could not see it "too well" because the sweatshirt was "in the way," that he "had no idea" what the bulge was, and that it "could [have been] anything."

Officer Vaillancourt addressed Mr. Golden. He identified himself as a police officer and, in a conversational tone, asked Mr. Golden whether he had any weapons on him. Mr. Golden said he did not. Officer Vaillancourt responded, "[C]an you just show me your waistband[?]" Mr. Golden, who was holding a cigar in his right hand, responded to this request by pulling up the middle and left side of his shirt from its tucked position under the sweatshirt with his free left hand. Officer Vaillancourt testified that this action made him more "concerned" because he suspected that Mr. Golden was "trying to avoid raising up the right" side of his shirt where the bulge was. But Officer Vaillancourt did not ask appellant to lift his shirt on the right side, nor did he ask about the bulge. Instead, he said to Mr. Golden, "I can't see your waistband because of the sweatshirt." Mr. Golden then removed the sweatshirt from around his waist and displayed it. When he held it out, the sweatshirt blocked Officer Vaillancourt's view of the bulge. Officer Vaillancourt believed Mr.

Golden "either was confused or trying to be evasive," and he suspected that the bulging object on Mr. Golden's right hip was a firearm.

Officer Vaillancourt then exited the SUV, walked up to Mr. Golden, and said, "I can't see your waistband now because you're showing me the sweatshirt. What do you have?" The officer still did not mention the bulge. Mr. Golden did not verbally respond; the record does not indicate how long Officer Vaillancourt waited for a response. Mr. Golden did, however, "lower[] his arms[,]" keeping hold of the sweatshirt with his free left hand. Without saying more, Officer Vaillancourt then "frisked the bulge" and "felt what [he] deemed to be a revolver." Officer Vaillancourt alerted the other officers, who left their vehicles and assisted in Mr. Golden's arrest. A crime scene officer was summoned to take photographs showing the appearance of the bulge before the police removed the gun from Mr. Golden's pants. As the trial judge later found when ruling on the suppression motion, "the bulge was not in the shape of a gun, [and] there was nothing distinctive about the nature of the bulge."

At the suppression hearing, Officer Vaillancourt articulated three reasons for believing, when he frisked Mr. Golden, that Mr. Golden was armed. First, Officer Vaillancourt noted, "most people are right-hand dominant so seeing that bulge there

in the right hip reminds me that's where I keep my gun." Second, the bulge was under "a sweatshirt that really seems unnecessary because it's a warm summer day," suggesting that "something is being concealed." And third, the officer stated, Mr. Golden had "refus[ed]" to display whatever was on his right side and had "meticulously" kept it covered with his shirt. Officer Vaillancourt did not explain what he meant by "meticulously."

Crediting Officer Vaillancourt's testimony, the trial court rejected Mr. Golden's arguments that the stop and frisk violated his Fourth Amendment rights. The trial court ruled that Mr. Golden was not seized within the meaning of the Fourth Amendment until Officer Vaillancourt frisked him, because Mr. Golden "stopped on his own accord" when the police SUVs pulled up in front and beside him; "Mr. Golden was not impeded or surrounded or hemmed in" and was "physically free to continue on his business"; and Officer Vaillancourt "simply asked two questions and made one statement" in a "conversational" tone of voice.[7]

---

[7] The trial court discounted Officer Anderson's activation of the emergency lights on his SUV because the evidence "did not establish that the flashing lights" were "visible to Mr. Golden" or "affected Mr. Golden's perception of the situation."

In addition, the court ruled that Officer Vaillancourt's frisk of Mr. Golden was supported by reasonable suspicion that Mr. Golden was armed, based on the factors the officer had identified: (1) the presence of a bulge on Mr. Golden's right hip, where "the officer credibly testified . . . people often carry a gun" (notwithstanding, the court said, that the bulge was nondescript and there was "no claim this was a high-crime . . . area"); (2) appellant's perceived evasiveness and failure to explain the bulge ("Mr. Golden decided to show only the front and left side" of his waistband and "did not provide any innocent explanation" for the bulge, said the court, and Officer Vaillancourt reasonably could conclude that "Mr. Golden could have raised [his] shirt on the right side, even though he was holding a cigar in his right-hand"); and (3) the fact that Mr. Golden "was carrying a sweatshirt and using it to conceal an object, even though there was no apparent need for a sweatshirt."

## II.     The Fourth Amendment

Not all street encounters with police trigger constitutional scrutiny. "[A]lthough there is an inherent inequality and vulnerability in most encounters with police, the Fourth Amendment calculus tolerates a measure of official pressure in exchange for needed cooperation from the public with police activities in

safeguarding safety and assisting with law enforcement."[8]  As a rule, however, an encounter implicates the Fourth Amendment right to be "secure . . . against unreasonable searches and seizures"[9] whenever an officer, "by means of physical force or show of authority, has in some way restrained the liberty" of a person.[10] "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."[11]  Even a brief restraining stop of a person is an unreasonable seizure in violation of the Fourth Amendment if it is conducted "for investigatory purposes" without "a reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity"[12]; and a protective frisk or pat down for weapons in the course of a reasonable stop is still an unreasonable search if it is conducted without "a reasonable, articulable suspicion that the person

---

[8]  *Dozier v. United States*, 220 A.3d 933, 943 (D.C. 2019).

[9]  U.S. Const. amend. IV.

[10]  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

[11]  *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks omitted).

[12]  *Henson v. United States*, 55 A.3d 859, 867 (D.C. 2012) (internal quotation marks and citations omitted); *see also Terry*, 392 U.S. at 21.

[the police] have detained is armed and dangerous."[13]  These standards reflect that "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."[14]

Mr. Golden contends he was subjected to an unreasonable seizure after four police officers suddenly drove up and stationed their unmarked SUVs perpendicular to each other, in front of him (blocking his path) and to his left as he walked down the street alone at night; Officer Vaillancourt immediately proceeded to ask him if he had any weapons on him; and, after he replied that he did not, the officer asked him to expose his waistband for inspection.  Mr. Golden further argues that he was subjected to an unreasonable search when Officer Vaillancourt frisked him.  The government argues that no seizure took place until the frisk, and that by then the

---

[13]  *Germany v. United States*, 984 A.2d 1217, 1222 (D.C. 2009); *see also Terry*, 392 U.S. at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.  And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.") (internal citations omitted).

[14]  *United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980) (internal quotation marks omitted) (opinion of Stewart, J.).

seizure and frisk were justified because Officer Vaillancourt had developed reasonable suspicion that Mr. Golden was armed and dangerous.

Whether and when Mr. Golden was seized within the meaning of the Fourth Amendment and whether and when law enforcement had the requisite reasonable articulable suspicion to stop and frisk him are questions of law that we review "*de novo*, deferring to the trial court's factual findings, unless [those findings are] clearly erroneous."[15]

## A. The Seizure

We determine whether a person has been seized by considering whether, in light of "all the circumstances surrounding the encounter[,] . . . the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."[16] This test

---

[15] *Jackson (Louis) v. United States*, 805 A.2d 979, 985 (D.C. 2002) (emphasis added) (citing *In re J.M.*, 619 A.2d 497, 500 (D.C. 1992) (en banc)).

[16] *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016) (quoting *Bostick*, 501 U.S. at 439).

"presupposes an *innocent* person."[17]  The question is "not what the defendant himself . . . thought, but what a reasonable [individual], innocent of any crime, would have thought had [they] been in the defendant's shoes."[18]  Our precedent instructs us to "take an 'earthy' and realistic approach" to this inquiry.[19]

The message that a suspect is not "free to leave or terminate the inquiry can be conveyed, not necessarily intentionally, in ways less obvious than actual physical force or explicit command."[20]  A police officer may effect a seizure without using physical force by means of a "show of authority" that, under the circumstances, would lead a reasonable person to believe they were not free to leave or terminate the encounter.[21]  If police behavior amounts to a show of authority without a physical touching, a seizure will be found if the person to whom the show is directed submits;

---

[17] *Bostick*, 501 U.S. at 438.

[18] *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007).  "Under this test, neither the subjective impressions of the defendant nor the subjective intentions of the officer determine whether a seizure has occurred."  *Id.*

[19] *Jackson (Louis)*, 805 A.2d at 988 (quoting *Cooper v. United States*, 368 A.2d 554, 557 (D.C. 1977)).

[20] *Jones (Albert) v. United States*, 154 A.3d 591, 595 (D.C. 2017).

[21] *Mendenhall*, 446 U.S. at 553–54.

"there is no seizure without actual submission."[22] "Submission . . . requires, at minimum, that a suspect manifest compliance with police orders" or requests.[23]

"The Supreme Court has repeatedly held that police do not manifest a show of authority 'merely [by] approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting some questions to him if the person is willing to listen,' provided the officers do not imply that answers are obligatory."[24] But such an encounter does rise to the level of a seizure if the police "convey a message that compliance with their requests is required."[25] Thus, brief inquiry in a non-hectoring, conversational tone or casual manner, unaccompanied by intimidating or coercive police conduct, likely would

---

[22] *Plummer v. United States*, 983 A.2d 323, 331 (D.C. 2009) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)); *see also California v. Hodari D.*, 499 U.S. 621, 626, 628–29 (1991). In contrast, "[t]he application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Torres v. Madrid*, 141 S. Ct. 989, 993 (2021).

[23] *Plummer*, 983 A.2d at 331 (quoting *United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009)).

[24] *United States v. Castle*, 825 F.3d 625, 633 (D.C. Cir. 2016) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)); *see also Bostick*, 501 U.S. at 434.

[25] *Bostick*, 501 U.S. at 435.

not rise to the level of a seizure.[26] In contrast, we have recognized that repeated or insistent (and implicitly accusatory) questions or requests designed to ferret out whether someone stopped on the street is in possession of weapons or contraband, particularly in conjunction with other intimidating or coercive circumstances, can create a powerful impression to any reasonable person that the police will not allow the suspect to terminate the inquiry and depart before satisfying the officers' concerns.[27]

---

[26] *See, e.g., Kelly v. United States*, 580 A.2d 1282, 1286 (D.C. 1990) (appellant not seized where officers "courteously" asked a few questions about his travel and whether he was carrying drugs); *Towles v. United States*, 115 A.3d 1222, 1231 (D.C. 2015) (one question in a "normal" tone posed to appellant whether he had a gun without other coercive conduct was not a seizure); *United States v. Lewis*, 921 F.2d 1294, 1297–98 (D.C. Cir. 1990) (no seizure when police officers, "displaying no weapons and speaking in a normal tone of voice, approach individuals in a public place and ask permission to talk with them" (citation omitted)). We do not wish to attach undue weight to a police officer's "conversational" tone in speaking to a suspect, however. The imbalance of power in such an encounter means the officer can speak softly and still be heard loud and clear. This court has acknowledged that police questioning does "not have to assume an intensity marking a shift from polite conversation to harsh words to create an intimidating atmosphere." *Guadalupe v. United States*, 585 A.2d 1348, 1361 (D.C. 1991).

[27] *See, e.g., Dozier*, 220 A.3d at 942 (recognizing "the apprehensiveness that would naturally be felt by a person unexpectedly accosted by police officers insistently asking questions in appellant's situation"); *Jones (Albert)*, 154 A.3d at 596 ("Where, as here, the questioning is at least implicitly accusatory (if not explicitly so), a reasonable person's natural reaction is not only to show respect for the officer's authority, but also to feel vulnerable and apprehensive."); *In re J.F.*, 19 A.3d 304, 309–10 (D.C. 2011) (although posing "a few questions to [appellant] by itself would not have led to a seizure," "there is much more here than mere

In the present case, we conclude that such a message was conveyed, and that a reasonable person in Mr. Golden's "shoes" would not have felt free to end the encounter unilaterally, once Officer Vaillancourt began asking Mr. Golden to expose his waistband to enable the officer to confirm that he was not carrying a gun there. To appreciate why the encounter became a seizure when Mr. Golden acquiesced at that point, it is necessary to consider the totality of the circumstances from the beginning.

While it can be said that almost any "encounter in which a visibly armed police officer" appears "without warning . . . to interrupt a person going about his private business is not an encounter between equals,"[28] this was not just *any* surprise encounter with the police. It commenced with an impressive show of police authority. Not one but four police officers in two unmarked vehicles simultaneously

---

questioning"); *Jackson (Louis)*, 805 A.2d at 988 (continued questioning after appellant complied with request to raise his jacket "adds to the circumstances that would convey to a reasonable innocent person that he was not going to be permitted to leave until the officer was satisfied with his answers or found what he was looking for"); *Hawkins v. United States*, 663 A.2d 1221, 1226 & n.20 (D.C. 1995) (after officers approached both sides of appellant's vehicle, "[a]ny objective belief that [he] was free to leave was further negated by [the officer]'s repeated questioning about whether appellant was carrying a weapon").

[28] *Jones (Albert)*, 154 A.3d at 595.

converged on and partially surrounded a lone pedestrian, with one of the vehicles blocking his path by stopping directly in front of him (a visible signal that the police intended for him to stop).[29] We do not conclude that Mr. Golden was seized at this initial point, but it is telling that he "froze" and appeared nervous. He reacted as any reasonable, innocent person in this situation might have done.

We have said that a street encounter with police may be "more intimidating if the person is by himself, if more than one officer is present, or if the encounter occurs in a location that is secluded or out of public sight."[30] In this case, Mr. Golden was by himself, at night, and the people seen standing around in the vicinity promptly

---

[29] *Cf. Michigan v. Chesternut*, 486 U.S. 567, 575 (1988) (listing operation of a police "car in an aggressive manner to block [an individual's] course or otherwise control the direction or speed of his movement" as one example of police conduct that might "communicate[] to the reasonable person an attempt to capture or otherwise intrude upon [the person's] freedom of movement"). The flashing emergency light on Officer Anderson's SUV would have enhanced the impact of the arrival of police if Mr. Golden was aware of it. *Id.* But as the trial court noted, the evidence did not uncontrovertibly establish that Mr. Golden saw the flashing light, though it is hard to see how he could have been oblivious to it. *Cf. People v. Brown*, 353 P.3d 305, 314 (Cal. 2015) (finding appellant was seized in vehicle where police stopped behind his car and activated their emergency lights, and holding that in the absence of evidence that appellant did not see emergency lights, the most logical inference is such a highly visible indicator would be perceived). Be that as it may, however, we do not view the flashing light as material to our conclusion in this case, given all the other factors we discuss showing that Mr. Golden was seized.

[30] *Jones (Albert)*, 154 A.3d at 596.

left when the interaction began.  It does not appear that any bystanders or passersby lingered long enough to witness the encounter.

The first thing Mr. Golden heard from the police after being stopped was Officer Vaillancourt's question — did *he* have any weapons on him?  By itself this did not amount to a seizure, but it is important to appreciate the question for what it was.  It would be a mistake to view the inquiry as equivalent to a simple request for information that an officer might put to an ordinary civilian who is not a suspect but merely may be helpful in an investigation.  With this question, the officer gave Mr. Golden reason to understand that a group of police officers in unmarked cars had singled him out and partially surrounded him because they suspected *him* of being armed and committing a crime at that very moment.  Mr. Golden (and any reasonable innocent person in his position) could not know what grounds the police had to suspect this, what else the police suspected about him, or how dangerous the police officers deemed him to be.  Such uncertainties contribute to a reasonable person's sense of powerlessness in an investigative confrontation by the police, regardless of the person's belief in their own innocence or their willingness to cooperate with law enforcement.[31]

---

[31] In *Dozier*, this court noted that an African-American male (such as Mr. Golden) who is confronted by "armed policemen" may have reason to be "especially

Officer Vaillancourt then did not take Mr. Golden's "no" for an answer. Manifesting disbelief of Mr. Golden's denial, the officer immediately asked him to prove he had no gun by exposing his waist so the officer could see for himself whether Mr. Golden was concealing a gun there or not. This took the encounter beyond mere questioning. It called upon Mr. Golden to acquiesce in a public unveiling of part of his body — first by lifting his shirt and then by removing his sweatshirt — for police to inspect in aid of a criminal investigation in which he was the target. And it implied the police would view Mr. Golden with heightened suspicion if he attempted to end the encounter without first exposing his waist.

An ordinary reasonable and innocent person, surrounded by police who persist in suspecting that person of carrying a firearm despite the person's denial, would not feel free to frustrate the police inquiry at that point by refusing to expose their body for visual inspection to prove their innocence. Humiliating as enduring the public spectacle might be for many, such an individual reasonably and naturally would fear the police will take a refusal as confirming their suspicions, not allow the suspect

---

apprehensive." 220 A.3d 933, 944 (D.C. 2019). While Mr. Golden's race thus is a relevant factor for consideration under our case law, its significance in the circumstances of this case was not raised in the proceedings below. Our seizure holding in this case would be the same without regard to that factor.

under their control to terminate their criminal investigation prematurely and depart, and instead only prolong their interference with the suspect's liberty.[32] The reasonable innocent individual thus would feel compelled to allay the officers' suspicions by acceding to their wishes in order to get the confrontation over with and be released.[33] At this juncture, we conclude, a reasonable person in Mr. Golden's shoes would feel they were being seized by the police.[34]

---

[32] *See, e.g.*, *Jones (Albert)*, 154 A.3d at 596 ("[A] reasonable person who can tell from the inquiries that the officer suspects him of something, and who cannot know whether the officer thinks there is sufficient reason to detain him, may well doubt that the officer would allow him to avoid or terminate the encounter and just walk away.").

[33] Theoretically, someone in Mr. Golden's shoes could have turned his back on the police and attempted to walk (or run) away. But while people do sometimes try to leave or flee from police in circumstances like this, it is unlikely that a reasonable innocent person in Mr. Golden's position would have felt comfortable doing so, or confident the police (undoubtedly viewing "flight" with suspicion) would not pursue and capture them if they attempted it. *See id.* at 596 n.14 ("[T]his court has seen many cases in which individuals who attempted to walk away from a police officer were prevented from doing so despite the absence of reasonable articulable suspicion to justify a stop." (collecting cases)).

[34] It is surely true that many reasonable innocent people, if they were stopped and questioned like Mr. Golden was, might not find the intrusion offensive because they trust the good faith of the police and wish to cooperate with their law enforcement efforts. Such people might not *want* to terminate the encounter unilaterally, but they still would not feel free to do so.

As we have said, a show of authority by the police does not effect a seizure unless the suspect submits. Mr. Golden did submit. There is no evidence he was anything less than compliant. He made no attempt to escape or fight with the police. That Officer Vaillancourt was uncertain whether Mr. Golden was being evasive when the officer asked him to expose his waist for inspection — a point we discuss further below — does not mean Mr. Golden failed to submit to the show of official authority.[35]

In sum, Mr. Golden, walking alone at night, was confronted by four police officers in two unmarked SUVs that pulled up and stopped in front of and beside him. Officer Vaillancourt immediately informed Mr. Golden that, yes, the officers suspected *him* of carrying a firearm. When Mr. Golden denied it, Officer Vaillancourt refused to accept that answer and pressed him to prove he had no gun by exposing his waist for visual inspection. "[I]n the absence of any sign that a reasonable person in these circumstances would believe the officer was giving [them] a genuine choice to decline the request[s]," the clear message conveyed to a

---

[35] *Cf. United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (suspect submitted to police authority when he put his hands on his car when instructed to do so, even though he subsequently fled from police, because "[l]ater acts of noncompliance do not negate a defendant's initial submission, so long as it was authentic").

person in Mr. Golden's position was that his submission was required.[36]  And he did submit.

In similar factual circumstances, other courts have reached the same conclusion we do, namely that the encounter attained the level of a Fourth Amendment seizure when the police officer called upon the suspect to expose his waistband (if the suspect acquiesced).  In *United States v. Gibson,*[37] Mr. Gibson was walking home from a bus stop around midnight when four Metropolitan Police Officers — all members of the Gun Recovery Unit (wearing tactical vests identifying them as "POLICE," patrolling in the area in an unmarked car) — came upon him.  The officers pulled up next to Mr. Gibson and one of them, Officer Wright, shined a flashlight at him, identified himself as a police officer, and asked Mr. Gibson if he had a firearm on him.  Mr. Gibson answered that he did not.  Officer Wright then said, "let me see your waistband."  In response, Mr. Gibson raised both his arms in the air.  Officer Wright then said, "lift your jacket."  At that point, Mr. Gibson turned and fled; as he ran, a gun fell out of his waistband.  The district court held that Mr. Gibson was seized within the meaning of the Fourth Amendment before he fled;

---

[36]  *Sharp v. United States*, 132 A.3d at 169.

[37]  366 F. Supp. 3d 14 (D.D.C. 2018).

seeing no material difference between "show me your waistband" and "let me see your waistband," the court concluded that under the totality of the circumstances, Officer Wright's "use of language" indicated that "compliance with the officer's request might be compelled," and that "a reasonable person would not have believed he was free to leave."[38]

Likewise, in *Lee v. State*,[39] the Maryland Court of Special Appeals held that the defendant Lee was seized where the "police had asked [him] to lift up [his] clothing and to expose part of [his] body after [he] had declined, on three occasions, to engage with them."[40] More specifically, two officers confronted Lee on foot outside a McDonald's restaurant; although the officers "did not surround him, back him into a corner, or eliminate all exit paths," they effectively "blocked all but one

---

[38] *Id.* at 27–28. *See also United States v. Veney*, 444 F. Supp. 3d 56, 62–64 (D.D.C. 2020) (concluding that a reasonable person in defendant Veney's position would not have felt free to leave where (1) the officer began by asking him if he had anything on him, and Veney replied in the negative; (2) the officer then asked Veney if he would "mind turning around for me," "a follow-up question, which indicated that he did not believe Veney's answer"; (3) Veney declined and said he was "going to walk off," which "[p]lainly . . . communicated that Veney desired to end his encounter with" the officer; and (4) the officer pressed, "No, I just want to make sure you don't got no guns," which "implied that [Veney] had no choice but to comply").

[39] No. 1435, 2015 WL 5969453 (Md. Ct. Spec. App. July 31, 2015).

[40] *Id.* at *11.

means of egress."[41]  One of the officers then asked Lee twice whether he was carrying a concealed gun, thereby "announc[ing] to any reasonable person in Lee's place that the officers suspected him of criminal activity."[42]  After Lee's responses that he had just gotten off the bus indicated that he wanted to be left alone,[43] the officer asked Lee, "Can you pull your shirt up for me?"[44]  At that point, the court concluded, "a reasonable person in Lee's position would believe that if he *did not* comply with [the officer's] final request, but instead tried to walk away, his decision would probably meet with an unwelcome show of police force:  the police would lift his shirt for him."[45]

In another case with factual similarities to this one, *United States v. Gross*, the D.C. Circuit held that the appellant had not yet been seized at this point in the

---

[41]  *Id.* at *8.

[42]  *Id.* at *9.  "Even though [the officer] spoke in a 'normal tone of voice,' this accusatory line of inquiry would have further heightened a reasonable person's sense that his or her freedom to leave or disengage from the officers was under threat."  *Id.*

[43]  *Id.*

[44]  *Id.*

[45]  *Id.* at *10.

chronology.[46]  But even if we were to agree with the reasoning or conclusion of *Gross*'s majority opinion on the facts presented there, the divergences between it and the case before us now warrant different outcomes.[47]

In *Gross*, the appellant was walking on a sidewalk at night when an unmarked car with four GRU officers slowed down and began driving parallel to him, separated by a lane of traffic between them.[48]  One of the officers "shined a flashlight on Mr. Gross to get his attention" and said, "[H]ey, it is the police, how are you doing? Do you have a gun?"[49]  Mr. Gross stopped but did not answer.[50]  The police stopped too, and the same officer asked, "Can I see your waistband?"[51]  Mr. Gross "responded by lifting his jacket slightly to show his left side."[52]  Although the officer who made the request was satisfied with that response, another officer exited the car and asked

---

[46]  784 F.3d 784 (D.C. Cir. 2015).

[47]  In *Gibson*, the district court similarly distinguished *Gross*.  In *Veney*, the court cited *Gross* and (presumably) viewed its decision as consistent with it.

[48]  *Id.* at 785, 787.

[49]  *Id.* at 785.

[50]  *Id.*

[51]  *Id.*

[52]  *Id.*

Mr. Gross, "[H]ey man, can I check you out for a gun?"[53] At that point, rather than submit, Mr. Gross ran away. When the officers caught him, they found a handgun in his waistband.[54] Mr. Gross argued the gun should be suppressed as the fruit of his unlawful seizure before he fled, "when [the first officer], speaking to him from the police car, asked if he was carrying a gun and would expose his waistband."[55] The appellate court majority concluded, however, that Mr. Gross was not seized then because (1) it is a "settled principle that 'a seizure does not occur simply because a police officer approaches an individual and asks a few questions;'" (2) the officer's questions were not accusatory; (3) the four officers were in the car and "separated from Gross by one lane of traffic;" and (4) the car approached appellant somewhat casually, without its sirens or flashers, and did not "block or control [appellant's] movement."[56]

Mr. Golden was met with a significantly greater show of authority by the police. The two unmarked SUVs approached him more confrontationally than the one car did Mr. Gross. There was no traffic lane to act as a buffer; in contrast, the

---

[53] *Id.* at 785–86.

[54] *Id.* at 786.

[55] *Id.* at 787.

[56] *Id.* at 787–88 (quoting *Bostick*, 501 U.S. at 434).

police officers in this case minimized the distance between themselves and Mr. Golden by pulling right up to the curb. And even if they did not physically and totally "block" Mr. Golden's movement, they at least "control[led]" it by parking directly in front of and beside him, in two perpendicular sides of a box. The character of the police questioning was subtly but significantly different as well. The officer in *Gross* asked to see Mr. Gross's waistband after Mr. Gross did not respond to his first question. In contrast, Mr. Golden did answer Officer Vaillancourt's first question, telling him he did not have any guns on him; yet the officer ignored his denial and asked to see Mr. Golden's waistband in spite of it. By essentially saying, "prove it," Officer Vaillancourt was not "merely" approaching an individual on the street and asking a few questions.[57] In our view, any reasonable innocent person in this kind of targeted confrontation with police would feel plainly accused at this point and under compulsion to respond.

To that point, the police had observed nothing more than Mr. Golden walking alone on a public street on a pleasantly warm evening, with a sweatshirt tied around his waist and a bulge that could have been "anything" on his right hip. The government concedes, and we agree, that this scant information did not justify a

---

[57] *See supra* notes 24-27 and accompanying text.

reasonable suspicion that Mr. Golden was carrying a firearm or engaged in any criminal activity. It therefore was not enough to support the officers' investigatory stop of Mr. Golden, and the evidentiary fruits of that suspicion-less seizure (specifically, the gun and ammunition recovered from Mr. Golden) should have been suppressed.

## B. The Frisk

We would reach the same conclusion even if we were persuaded by the government's argument that Mr. Golden was not seized within the meaning of the Fourth Amendment until Officer Vaillancourt actually undertook to frisk him. Not even then, we conclude, did the police have sufficient basis for a reasonable articulable suspicion that Mr. Golden was armed.

We have summarized the principles of objectivity, specificity, and logic that guide our evaluation of a claim of reasonable articulable suspicion as follows:

> In considering whether the totality of the circumstances gave rise to reasonable articulable suspicion, we do so "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.". . . [C]onclusory statements expressing an officer's belief that a person is involved in criminal activity are insufficient to establish reasonable articulable suspicion. *See Terry* [*v. Ohio*, 392 U.S. 1, 27

(1968)] (rejecting as incompatible with the Fourth Amendment, seizures based on an "inchoate and unparticularized suspicion or hunch"). "Reasonableness" – the touchstone of the Fourth Amendment – in the context of a seizure requires "some minimal level of objective justification . . . ." *INS v. Delgado*, 466 U.S. 210, 217 (1984). That level of justification, reasonable articulable suspicion, is "less demanding" than probable cause and "considerably less" than preponderance. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). But even though not a demanding standard, to be "reasonable" the suspicion must be based on facts that would have led another officer to have a similar suspicion. Moreover, to be "articulable," there must be specific evidence – not merely conclusions – that led the officer to suspect criminal activity in a particular circumstance. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). These two requirements are not only the minimal safeguard of a person's constitutionally protected freedom to go about without coercion or seizure, but also are necessary for meaningful judicial evaluation of police action. [58]

In evaluating the totality of circumstances, we recognize that no factor on which an officer relies can be viewed "in isolation" or rejected simply because it is "readily susceptible to an innocent explanation."[59] Thus, we examine all the factors "individually and collectively."[60] We appreciate, however, that "some factors are

---

[58]  *Singleton v. United States*, 998 A.2d 295, 300–01 (D.C. 2010) (some internal citations omitted).

[59]  *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

[60]  *Smith v. United States*, 558 A.2d 312, 314 (D.C. 1989).

more probative than others,"[61] and that if the observed "behavior of a suspect is capable of too many innocent explanations,"[62] the logical gap between that behavior and the officer's suspicion signals that the intrusion was unreasonable.

The factors on which Officer Vaillancourt and the trial court relied as justifying the frisk of Mr. Golden were: (1) the presence of a bulge on Mr. Golden's right hip; (2) its partial concealment from view by a supposedly unneeded sweatshirt around Mr. Golden's waist; and (3) Mr. Golden's failure to provide an "innocent explanation" for the bulge and his possibly evasive failure to facilitate Officer Vaillancourt's view of it when the officer asked to see his waist. To these three factors the government adds Mr. Golden's apparent nervousness in the presence of the police. For the following reasons, we conclude that these factors do not withstand scrutiny and, taken together, did not furnish an objectively reasonable basis for Officer Vaillancourt to suspect that the bulge was a weapon.

First, as the trial court found (and the government does not dispute), the bulge Officer Vaillancourt saw on Mr. Golden's right hip was not in the shape of a gun

---

[61] *Arvizu*, 534 U.S. at 277.

[62] *In re A.S.*, 827 A.2d 46, 48 (D.C. 2003) (quoting *Duhart v. United States*, 589 A.2d 895, 899 (D.C. 1991)).

and was not distinctive in any way; in the officer's own words, he recognized at the time that it "could be anything." A "generic bulge" in the location the officer saw it "can be explained by too many innocent causes to constitute 'reasonable' suspicion" by itself.[63] When we and other courts have held it reasonable to infer that a bulge in a suspect's clothing was a firearm, there were additional observed facts about the bulge, the suspect's actions linked to it, and/or other circumstances that supported the inference.[64]

---

[63] *Singleton*, 998 A.2d at 302 (citing cases).

[64] *See, e.g.*, *United States v. Richmond*, 924 F.3d 404, 411–12 (7th Cir. 2019) (officers had reasonable suspicion that defendant with a bulge in his t-shirt pocket was illegally carrying a gun when he was "walking down the street near midnight in a neighborhood plagued by drug trafficking and gun violence" and, after officers passed him in marked squad car, he "quickened his pace, changed his direction, cut across a property, and hid . . . [an object] between the screen door and front door"); *United States v. Aitoro*, 446 F.3d 246, 249, 252–54 (1st Cir. 2006) (officers could reasonably infer that defendant with a bulge in his waistband was carrying a gun where he and his companion, upon spotting police in a high-crime neighborhood, audibly swore, "did an abrupt about-face[,]" sprinted in the other direction, and were later apprehended while "looking warily over their shoulders, as if concerned about pursuers"); *United States v. Wilson*, 953 F.2d 116, 125 (4th Cir. 1991) ("Our decisions that mention bulges as a factor in the reasonable-suspicion analysis all involve attempts by a suspect to hide the bulge and/or the observation of a bulge in an unusual location.") (collecting cases); *New York v. Marine,* 142 A.D.2d 368, 371–72 (N.Y. App. Div. 1989) (noting "the well-settled rule that a pat down or frisk . . . may not be predicated merely on the observation of an undefinable bulge in a jacket. Rather, there must be proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief that the defendant [has] a gun in his possession.") (internal quotation marks omitted); *Commonwealth v. Mathis*, 125 A.3d 780, 793 (Pa. 2015) (explaining that officers may not "conduct[] a frisk based on some amorphous, unidentifiable bulge in the defendant's clothing,

In *Singleton*, for example, the officer did not just see a bulge that could have been a gun in the appellant's front pants pocket; the officer testified that based on his experience with firearms, the appellant's "protective hand gesture over that pocket" and "stiff gait" were how the officer knew a person would walk and act with an unholstered gun in their pocket, in order to "brace it so something does not get in the trigger guard."[65]  Further, upon seeing the officer behind him, the appellant in *Singleton* repeatedly looked back over his shoulder at the officer, hastened his pace, and attempted to walk away.[66]  In holding these facts sufficient to give the officer reasonable articulable suspicion to stop and frisk the appellant, we emphasized that we based our conclusion "on the 'totality of the circumstances,' which in this case included not only a bulge 'consistent' with a firearm that initially aroused suspicion, but, importantly, also a number of other factors that corroborated the officer's initial

---

absent any other circumstances which reasonably supported the conclusion that the defendant was armed and dangerous"); *Moody v. State*, No. 1003, 2020 WL 416412, at \*9–\*10 (Md. Ct. Spec. App. Jan. 27, 2020) (officers had reasonable suspicion that defendant with a bulge in his waistband was carrying a handgun where he "picked up his walking pace" upon seeing a marked police vehicle in a high-crime area, ignored subsequent police requests to "hold up" while striding even faster, turned his body so as to obscure the bulge from officers, and attempted to climb over a fence).

[65] *Singleton*, 998 A.2d at 301.

[66] *Id.*

suspicion that the object in appellant's pocket was a firearm."[67]  And we cautioned that "the objective evidence in this case is close to the minimum required to pass constitutional muster and permit meaningful judicial evaluation."[68]

Unlike the officer in *Singleton*, Officer Vaillancourt did not link the nondescript bulge to any distinctive behavior by Mr. Golden indicating that the bulge was a gun (or any other weapon).  Officer Vaillancourt offered only that the location of the bulge on Mr. Golden's right hip "reminds me that's where I keep my gun." This was "a purely subjective impression" that affords no insight at all into whether Mr. Golden was carrying a gun or something else on *his* hip.[69]  The generalization that people (at least, right-handed people)[70] who do have guns often carry them on

---

[67]  *Id.* at 302 (internal citation omitted).

[68]  *Id.*

[69]  *See id.* ("[E]ven though a particular officer might believe a bulge conceals a weapon, a purely subjective impression is not an 'objective justification' that can be judicially examined against the requirements of the Fourth Amendment.").  *See also Ransome v. State*, 816 A.2d 901, 906 (Md. 2003) (taking judicial notice of the fact that "most men . . . carry innocent personal objects in their pants pockets — wallets, money clips, keys, change, credit cards, cell phones, cigarettes, and the like — objects that, given the immutable law of physics that matter occupies space, will create some sort of bulge").

[70]  The record is silent as to whether Mr. Golden is right-handed.

their right hips is equally unilluminating for the same reason.[71]  These were not

observations about the character of the bulge on Mr. Golden's hip or revelatory

behavior by Mr. Golden supporting a "rational inference" that *he* was armed.[72]

Second, that Mr. Golden had a sweatshirt tied around his waist lent no

objective support to Officer Vaillancourt's suspicion that the bulge was a gun (or,

for that matter, to a suspicion that any other criminal activity was afoot).  The

officer's inference — it was a warm night, so Mr. Golden did not need to wear a

sweatshirt, and therefore he was using it for purposes of concealment — was little

more than speculation, a pure hunch based on dubious logic and questionable

assumptions.  If anything, the warm weather was a reason sufficient in itself to

explain why Mr. Golden had tied the sweatshirt around his waist (as people

commonly do with sweatshirts when it warms up) instead of wearing it over his shirt.

And there was nothing inherently suspicious, or suggestive of a desire for

concealment, about either carrying or wearing an ordinary sweatshirt outside on a

---

[71]  It is logically fallacious to reason backwards from the generalization, that right-handed people who possess guns often carry them on their right hips, to the converse conclusion that people carrying unknown things on their right hips are often right-handed and carrying guns there; "if *a* then *b*" does not mean "if *b* then *a*."

[72]  *Terry*, 392 U.S. at 21.  Compare the cases cited in footnote 64, *supra*.

warm night.[73]   Sartorial habits and sensitivity to temperature vary greatly from person to person, as do expectations of what the weather will be; and even when it is warm outside, *indoor* environments where people work or visit are often air-conditioned and cool enough to call for more than shirtsleeves.  It would be more accurate to say, as courts in similar cases have done, that wearing a sweatshirt in warm weather is "mundane"[74] and "typical of countless innocent people"[75] — so common that it normally lends scant if any support to a suspicion that the wearer is armed or has criminal proclivities.[76]  Furthermore, Mr. Golden's sweatshirt in this

---

[73]   *People v. Thomas*, 29 Cal. App. 5th 1107, 1117 (Cal. Ct. App. 2018) (defendant wearing a jacket and a sweatshirt on a "pretty warm day" did not "provide reasonable grounds to believe he was armed and/or dangerous and might gain immediate control of a weapon").

[74]   *Burkett v. State*, 736 N.E.2d 304, 306, 308 (Ind. Ct. App. 2000) (no reasonable suspicion to believe man armed and dangerous where the man wore a sweatshirt in 76-degree weather, was in a high-crime area, and walked away from the police on seeing them).

[75]   *United States v. Jones (Fonta)*, 606 F.3d 964, 967–68 (8th Cir. 2010) (quoting *United States v. Crawford*, 891 F.2d 680, 682 (8th Cir. 1989)).

[76]   This is not to say that out-of-season clothing is *never* probative of illegal activity or that it never has some corroborative significance.  For example, where the clothing itself is of a kind closely associated with crime and other circumstances make it likely that the item's only purpose is to conceal contraband or identity, such evidence may support reasonable suspicion and a *Terry* stop or frisk.  *See Thomas v. United States*, 553 A.2d 1206, 1207–08 (D.C. 1989) (presence of a ski mask in a rental car in July justified a stop, as ski masks are "commonly used" in armed hold-ups *and* a ski mask was unlikely to be innocently left as a holdover from winter in a rental car); *United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005) (explaining that

case did not in fact conceal the bulge on his right side. Despite the sweatshirt, Officer Vaillancourt was able to see the bulge from his SUV, and if the sweatshirt did partially obscure it, there is no evidence that this reflected an intent to conceal it, since Mr. Golden's removal of the garment revealed nothing more about the bulge. On the contrary, the officer still deemed it necessary to frisk Mr. Golden to determine what the bulge was. Nor did Mr. Golden evince reluctance to remove the sweatshirt; when Officer Vaillancourt complained that it obstructed his view of Mr. Golden's waistline, Mr. Golden immediately untied the sweatshirt and took it off without being asked.

Third, the suggestion that Mr. Golden intentionally frustrated or impeded Officer Vaillancourt's efforts to view the bulge on his right hip is not substantiated. If anything, it is contradicted by the officer's account of Mr. Golden's actual behavior. To begin with, no adverse inference can be drawn from Mr. Golden's failure to provide an innocent explanation for the bulge, since he was never asked to

---

totality of the circumstances "pointed towards a criminal design" where defendants' decision to wear "hooded sweatshirts tightly wrapped around their heads, while conceivably protecting against the weather, also suggested an intent to disguise the two men's identities[,]" and defendants' latex gloves were "of a type less suited to keeping out the cold than concealing fingerprints."). And there may be other examples in which particular clothing, while not independently suspicious as a typical instrumentality of crime, is not entirely without significance in the totality of circumstances confronting a reasonable police officer.

explain it; Officer Vaillancourt never mentioned the bulge during the encounter. Nor does the evidence show that Mr. Golden "refused" (in the officer's words) to display what was on his right side, or (in the trial court's characterization) that he "decided" to show "only" the front and left side of his waistband. Those are subjective assessments unsupported by the objective facts. The officer's factual testimony was that he merely asked Mr. Golden to "show me your waistband." Mr. Golden cooperated with that request by using his free hand to pull up both the middle and left side of his shirt. Officer Vaillancourt did not then (or ever) ask Mr. Golden to show him *the rest* of his waistband, or the right side in particular, so there was no "refusal" or demonstrable "decision" not to do so.[77] Given the vagueness and insufficiency of the officer's requests, the suggestion that Mr. Golden "could have" put his full waist on display is of little or no significance.

Rather than asking Mr. Golden to do anything else after he pulled up his shirt to reveal his waist, Officer Vaillancourt merely declared that he could not see Mr. Golden's waistband because of the sweatshirt. This obviously did not identify the right side as the area of interest. But in what is most naturally interpreted as a good

---

[77] *Cf. United States v. Hill*, 811 F. App'x 761, 764 & n.4 (3rd Cir. 2020) (officer had reasonable suspicion required to conduct a protective frisk where defendant "repeatedly returned his hands to [the] pockets [of his sweatshirt], despite requests not to do so, suggesting that he may have been armed").

faith effort by Mr. Golden to satisfy the officer's expressed concern, even though he was not asked to do so, Mr. Golden promptly untied and took off the sweatshirt and held it out away from his torso. That it still blocked Officer Vaillancourt's view of what he wanted to see is hardly indicative of evasion, especially since Mr. Golden subsequently lowered the sweatshirt with his left hand, thereby leaving his right side — where the bulge was located — exposed to the officer's view. Indeed, even Officer Vaillancourt admitted he was unsure how to interpret Mr. Golden's action, saying "*either* he was confused or trying to be evasive."[78] On this record, we are unable to see how appellant's behavior could reasonably be viewed as suspiciously evasive or defiant.[79]

---

[78] Of course, another possible explanation, supported by the evidence, is that Officer Vaillancourt himself failed to make clear what he wanted to see and what he wanted Mr. Golden to do.

[79] *See, e.g.*, *Robinson v. United States*, 76 A.3d 329, 337–38 (D.C. 2013) (holding that "a police officer would have to speculate" impermissibly to interpret suspect's "open and obvious" and ambiguous "side to side" hand movements, after being asked whether he had a gun, as indicating the suspect was armed); *In re A.F.*, 875 A.2d 633, 635–36 (D.C. 2004) (affirming the trial court's determination that appellant's movements — walking away from officers, then returning and sitting in the passenger seat of a parked car — were too ambiguous to constitute "evasive action"); *Jackson (Tyrone) v. United States*, 56 A.3d 1206, 1213–14 (D.C. 2012) (noting that movement of suspect's hands along the dashboard of his vehicle was not "sufficiently remarkable to justify search"); *Wilson v. United States*, 802 A.2d 367, 372 (D.C. 2002) (contrasting appellant's evasive pattern of conduct, which consisted of "accelerating his pace as he walked down the hallway, turning the corner as if in a rush, and banging on an apartment door" with the "ambiguous" act of walking quickly) (internal quotation marks omitted); *United States v. Woodrum*, 202 F.3d 1,

Fourth, the trial court appropriately gave "very little weight" to Mr. Golden's apparent nervousness in his encounter with the officers, in line with numerous cases doubting the probative value in the reasonable suspicion analysis of nervousness in the presence of police.[80] Who among us would not have been uneasy if a squad of police suddenly appeared, partially surrounded us on the street at night, and began interrogating us as a criminal suspect? Mr. Golden's purported nervousness might

7 (1st Cir. 2000) (declining to address whether defendant's act of slouching down in the back seat of a vehicle was evasive behavior for the purposes of reasonable suspicion analysis given that "the question can be argued persuasively either way"); *United States v. Wright*, 856 F.Supp.2d 736, 743–44 (W.D.N.C. 2012) (finding that "the government's inference of evasive activity does not line up with the facts of record" where evidence showed only that defendant backed his vehicle "away from one unmarked car with a detective inside towards another unmarked car with a uniformed police officer inside").

[80] *See, e.g., In re D.T.B.*, 726 A.2d 1233, 1236 (D.C. 1999); *Anderson v. United States*, 658 A.2d 1036, 1040 (D.C. 1995); *In re R.M.C.*, 719 A.2d 491, 496 (D.C. 1998); *Powell v. United States*, 649 A.2d 1082, 1087 (D.C. 1994); *see also Ransome*, 816 A.2d at 908 (Md. 2003) (nondescript bulge, combined with appellant's nervousness and presence in a high-crime area insufficient to find reasonable suspicion); *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) ("Although nervousness may be considered as part of the overall circumstances giving rise to a reasonable suspicion, this court has found nervousness inherently *unsuspicious,* and has therefore given it very limited or no weight in the reasonable-suspicion calculation."); *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness is a common and entirely natural reaction to police presence…."); *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) ("[I]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.") (internal quotation marks and citations omitted).

have some corroborative value if, as in *Singleton*, it was linked to some objective evidence that he was carrying a firearm, but it is not. Without such a connection, his uneasiness (like his other conduct) was "capable of too many innocent explanations" and too ambiguous to be of much help to the reasonable suspicion analysis.[81]

Thus, when considered individually, each of the factors relied upon to support the frisk — Officer Vaillancourt's observation of a nondescript bulge on Mr. Golden's right hip, the officer's association of that bulge with where he holsters his own firearm, Mr. Golden's possession of a sweatshirt tied around his waist on a warm evening, Mr. Golden's (at most) imperfect compliance with Officer Vaillancourt's request to inspect his waist, and Mr. Golden's nervousness during the encounter — is excessively ambiguous and of little objective significance. It remains to address their cumulative probative value in light of all the surrounding circumstances. Given (1) how little each factor contributes to a reasonable, particularized suspicion, as opposed to a mere hunch, that Mr. Golden was concealing a weapon, (2) the absence of any surrounding circumstances indicating that Mr. Golden was armed or engaged in criminal activity, and (3) that the several factors do not materially reinforce each other or fit together in any logical way so as

---

[81] *In re A.S.*, 827 A.2d at 48.

to be more than the sum of their parts, we think that they add up to too little and fail to furnish a sufficient justification for the frisk. Viewing the totality of the circumstances from the perspective of a reasonable, cautious, and experienced police officer on the scene, we must conclude that Officer Vaillancourt did not have objectively reasonable grounds to suspect Mr. Golden of being armed and dangerous — the grounds necessary to justify frisking him. Accordingly, even if we were to agree that Mr. Golden was not seized until he was frisked, the fruits of the frisk still should have been suppressed.

### III.    Remaining Claims

Mr. Golden raises three additional claims of constitutional error. First, invoking his Sixth Amendment right of confrontation, he claims the trial court erred in precluding bias cross-examination of Officer Vaillancourt. The proposed cross-examination would have been based on information that (on occasions other than Mr. Golden's arrest) the officer had been seen wearing a sweatshirt with a violent logo and slogan evincing hostility toward gun suspects.[82] The trial court ruled that

---

[82] *See Howard v. United States*, 241 A.3d 554, 564 n.9 (D.C. 2020) (noting that defense counsel was permitted to cross-examine a GRU officer about his having worn a "GRU logo" displaying "'a skull and cross bones' with 'a bullet hole through

the probative value of the proposed cross-examination was substantially outweighed by the dangers of unfair prejudice to the government, confusion of the issues, distraction of the jury, and waste of time. Evaluation of this claim of error (which the government vigorously disputes) would require us to scrutinize the record and assess the probative value of the proposed cross-examination, the concerns identified by the trial judge, the extent to which the defense was able to pursue and argue the same theory of bias in other ways, and ultimately whether any constitutional error was harmless beyond a reasonable doubt.[83]

Second, Mr. Golden argues that the trial court erred in denying his motion for a new trial based on a claimed *Brady*[84] due process violation — namely, the government's failure to disclose before trial the finding by another judge of the Superior Court that Officer Wright had testified falsely about an illegal stop in a case factually similar to Mr. Golden's case. Evaluation of this claim of error would

---

the center of the skull in between the eyes,' 'handcuffs,' a gun, and the motto 'vest up, one in the chamber'").

[83] *See, e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Longus v. United States*, 52 A.3d 836, 851 (D.C. 2012); *Blades v. United States*, 25 A.3d 39, 44 (D.C. 2011); *Hollingsworth v. United States*, 531 A.2d 973, 979-80 (D.C. 1987).

[84] *Brady v. Maryland*, 373 U.S. 83 (1963).

require us to assess whether that information was material, i.e., whether there is a reasonable probability that, had the information been disclosed, the defense would have made use of it and the result of the proceeding would have been different,[85] even though the government did not call Officer Wright as a witness, either at the hearing on Mr. Golden's suppression motion or at his trial.

Third, Mr. Golden argues that his CPWL, UF, and UA convictions must be vacated because they violate the Second Amendment. At the time of his arrest in 2015, District of Columbia law required an applicant for a license to carry a handgun to show "good reason to fear injury to his or her person or property or . . . other proper reason for carrying a pistol."[86] In 2017, the Court of Appeals for the District of Columbia Circuit held the "good reason" requirement unconstitutional in *Wrenn v. District of Columbia.*[87]

---

[85] *See, e.g.*, *Vaughn v. United States*, 93 A.3d 1237, 1254 (D.C. 2014).

[86] D.C. Code § 22-4506(a) (2016); *see also id.* § 7-2509.11(1) (2016). Appellant argues that because he was a Maryland resident seeking to carry his handgun in the District, he also had to meet the "good reason" requirement in order to register the gun in the District. *See* D.C. Code §§ 7-2502.02(a)(4)(C), 7-2509.2(a) (2016).

[87] 864 F.3d 650, 661, 666 (D.C. Cir. 2017). In so holding, the *Wrenn* court instructed the district court to enter permanent injunctions against the District's enforcement of the "good reason" requirement. *Id.* at 668.

In the proceedings below, which preceded *Wrenn*, Mr. Golden moved to dismiss his indictment on the ground that the "good reason" requirement had unconstitutionally made it impossible for him to register and carry a handgun lawfully in the District of Columbia. The trial court denied that motion principally on the ground that Mr. Golden did not contend he was carrying the gun for self-defense or other proper reasons.

This court, having noted that it was not "bound" by the decision in *Wrenn*, has yet to weigh in on the constitutionality of the "good reason" requirement.[88] Doing so would be a significant undertaking in itself. But even if we "assume that *Wrenn* was decided correctly,"[89] proper evaluation of appellant's Second Amendment claim would require a remand for further proceedings in the trial court to determine whether, but for the "good reason" requirement, Mr. Golden would have been eligible and able to register and obtain a license to carry his gun in the District of

---

[88] *See Hooks v. United States*, 191 A.3d 1141, 1144 n.3 (D.C. 2018); *see also Dubose v. United States*, 213 A.3d 599, 603 (D.C. 2019). This is not to be understood as a sign of disrespect for the D.C. Circuit's decision; rather, in neither case did this court find it necessary to reach the difficult constitutional issue. (It is worth adding that *Wrenn* itself was not a unanimous decision, and that the dissenting judge would have upheld the constitutionality of the "good reason" requirement.)

[89] *Hooks*, 191 A.3d at 1144.

Columbia.[90]    The government disputes this, asserting, for example, that Mr. Golden's gun was reported stolen.

Given our reversal of Mr. Golden's convictions on Fourth Amendment grounds, however, we consider it appropriate, in the exercise of our discretion, not to undertake to resolve Mr. Golden's Second, Fifth, or Sixth Amendment claims. Although our decision does not mean Mr. Golden's retrial is barred on Double Jeopardy grounds,[91] our Fourth Amendment holding precludes the government from introducing, at any retrial, its evidence concerning Mr. Golden's possession of a gun — without which it appears highly unlikely that the government would be able to convict him of the charged crimes of CPWL, UF, or UA in any retrial.  This means that Mr. Golden's other constitutional claims are, in all likelihood, moot, as there would be nothing left in this case that can turn on how we might resolve them.

To be sure, we cannot say definitively that our Fourth Amendment holdings render a retrial utterly impossible.  But even allowing for the (seemingly remote)

---

[90]  *See id.* at 1145–46; *Dubose*, 213 A.3d at 605; *Jackson (Otis) v. United States*, 76 A.3d 920, 944 (D.C. 2013).

[91]  This is because the evidence at trial, *including* the evidence that should have been excluded on Fourth Amendment grounds, was sufficient to support Mr. Golden's convictions.  *See Lockhart v. Nelson*, 488 U.S. 33, 40–42 (1988); *Evans v. United States*, 122 A.3d 876, 886–87 (D.C. 2015).

possibility of a retrial, there are additional reasons that counsel against addressing Mr. Golden's remaining claims at this time. The proposed bias cross-examination issue might not recur in any retrial, and if it were to recur, its resolution likely would depend on a record-specific, discretionary balancing by the trial judge of probative value against the dangers of unfair prejudice, confusion of the issues, and the like. Whichever way we might rule on the question on the existing record therefore is unlikely to be dispositive for any retrial. The *Brady* issue appears to be academic, given that the previously undisclosed information bearing on Officer Wright's credibility is now known by the defense and would be available for use in any retrial. Finally, as to the Second Amendment claim, it appears that the United States does not take issue with the holding of *Wrenn*, but contends that Mr. Golden would not have been able to register and obtain a license to carry his gun but for the "good reason" requirement. In the unlikely event of a retrial, a fuller record would need to be created to resolve that question.

We thus are persuaded, in the exercise of our discretion, not to reach the remaining claims of error after having concluded that Mr. Golden's convictions must be vacated on Fourth Amendment grounds.

**IV.**

For the foregoing reasons, we vacate appellant's convictions and remand for such further proceedings, if any, as may be appropriate.

*So ordered.*